IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

APR 0 8 2002

Michael N. Milby
Clerk of Court

| | |
|---|---|
| MICROTHERM, INC.; MAVID &ast; <br> MAQUILADORA,M and DAVID E. &ast; <br> SEITZ, Individually &ast; <br> &ast; <br> VS. &ast; <br> &ast; <br> TRIQUEST-PUGET PLASTICS, L.L.C., &ast; <br> A Subsidiary of ARCTIC SLOPE &ast; <br> REGIONAL CORPORATION; ARCTIC&ast; <br> SLOPE REGIONAL CORPORATION; &ast; <br> EMERSON ELECTRIC CO.; &ast; <br> WIEGAND APPLIANCE DIVISION &ast; <br> OF EMERSON ELECTRIC CO.; &ast; <br> CHROMOLOX, INC.; DANA &ast; <br> CORPORATION; and DANA ENGINE &ast; <br> CONTROLS &ast; | CIVIL ACTION NO. B-02- 069 |

## NOTICE OF REMOVAL

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

COME NOW EMERSON ELECTRIC CO. and WIEGAND APPLIANCE DIVISION OF EMERSON ELECTRIC CO., Defendants in the above entitled and numbered cause, and file this their Notice of Removal of the present cause from the 357th Judicial District Court of Cameron County, Texas, in which it is now pending, to the United States District Court for the Southern District of Texas, Brownsville Division, showing the Court as follows:

1.      This cause was commenced in the 357th Judicial District Court, Cameron County, Texas, on March 5, 2002, when Plaintiffs' Original Petition was filed in Cause Number 03-933-E.   A copy of Plaintiffs' Original Petition is attached hereto and incorporated herein for all purposes to this Notice of Removal.

2.      Defendants Emerson Electric Co. and Wiegand Appliance Division of Emerson Electric Co. were served with a copy of the Plaintiffs' Original Petition on

March 19, 2002. Defendant Dana Corporation was served with a copy of the Plaintiffs' Original Petition on March 19, 2002. A copy of the returned citations served on Defendants indicating date of service is attached hereto and incorporated herein for all purposes. According to the State Court docket sheet, the remaining Defendants have not yet been served with process in this case.

3.      This is a civil action for damages allegedly incurred by Plaintiffs relating to the production of a tankless water heater. Plaintiffs allege causes of action against Defendants for breach of contract, violations of the Texas Deceptive Trade Practices Act, fraud and misrepresentation, and negligence.

4.      Plaintiffs allege in Plaintiffs' Original Petition that Plaintiff Microtherm, Inc. is a Texas corporation with its principal place of business in Harris County, Texas. Plaintiff Microtherm, Inc. is therefore a citizen of Texas. Plaintiffs allege in Plaintiffs' Original Petition that Plaintiff Mavid Maquilador, S.A. is a Mexican corporation. Plaintiff Mavid Maquilador, S.A. is therefore a citizen of Mexico. Plaintiffs allege in Plaintiffs' Original Petition that Plaintiff David E. Seitz is an individual residing in Montgomery County, Texas. Plaintiff David E. Seitz is therefore a citizen of Texas.

5.      Defendant Emerson Electric Co. is a foreign corporation, incorporated in the State of Missouri, with its principal place of business in Missouri. Defendant Wiegand Appliance Division of Emerson Electric Co. is not a separate legal entity from Emerson Electric Co., and thus, to the extent it is a proper party, is incorporated in Missouri with its principal place of business in Missouri.

6.      Defendant Triquest-Puget Plastics, L.L.C., is a Washington corporation with its principal place of business in Washington. Arctic Slope Regional Corporation is an Alaska corporation with its principal place of business in Alaska. Defendant Chromalox, Inc. is a Delaware corporation with its principal place of business in

Pennsylvania. Defendants Dana Corporation is an Ohio corporation with its principal place of business in Ohio. Defendant Dana Engine Controls is an Ohio corporation with its principal place of business in Kansas.

7.    For the purposes of federal removal jurisdiction pursuant to 28 U.S.C. §1441, complete diversity of citizenship existed at the time this lawsuit was filed and now exists between the adverse parties in the present cause.

8.    Defendants would further show the Court that Plaintiffs' Original Petition seeks unspecified damages; however, based on the allegations and damages alleged in Plaintiffs' pleadings, Plaintiffs are seeking to recover from Defendants damages well in excess of $200,000.00.  See Original Petition at p. 25.

9.    Upon filing of this Notice of Removal of this cause, written notice of the filing by petitioners to Plaintiffs and their counsel has been provided as required by law. A copy of this notice is also being filed with the Clerk of the State Court in which this cause was originally filed.

10.    This Notice of Removal is timely filed in accordance with 28 U.S.C. §1446(b), in that it is filed within thirty (30) days of service of Plaintiffs' Original Petition on the first-served Defendant and within one year of the initial filing of the lawsuit.

11.    Defendants would further show that all Defendants have consented to the removal of this action as indicated by the Consents to Removal attached hereto.

12.    Defendants hereby request a trial by jury.

WHEREFORE, PREMISES CONSIDERED, Petitioners pray for removal of the above entitled and numbered cause from the 357th Judicial District Court of Cameron County, Texas to this Honorable Court.

Respectfully submitted,

RODRIGUEZ, COLVIN & CHANEY, L.L.P.

By: _Eduardo Roberto Rodriguez_
    Eduardo Roberto Rodriguez
Attorney-in-Charge
State Bar No. 17144000
Federal Admissions No. 1944
    R. Patrick Rodriguez 24002861
State Bar No. 17146600
Federal Admissions No. 22949
1201 East Van Buren
Post Office Box 2155
Brownsville, Texas 78522
(956) 542-7441
Fax (956) 541-2170


    Timothy G. O'Neill
Colorado Bar No. 17311
Federal Admissions No. 18694
    Brent D. Anderson
Texas Bar No. 00786977
Federal Admissions No. 17874
SNELL & WILMER, L.L.P.
Tabor Center, Suite 1900
1200 Seventeenth Street
Denver, Colorado 80202
(303) 634-2000
Fax (303) 634-2020

ATTORNEYS FOR DEFENDANTS,
EMERSON ELECTRIC CO. and WIEGAND
APPLIANCE DIVISION OF EMERSON
ELECTRIC CO.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of Notice of Removal was served upon all counsel of record, to-wit:

> Steve A. Bryant
> Steve A. Bryant & Associates, P.C.
> 3618 Mt. Vernon, Suite A
> Houston, Texas 77006
> Attorneys for Plaintiffs
>
> William D. Wood
> Graig J. Alvarez
> Fulbright & Jaworski, LLP
> 1301 McKinney, Suite 5100
> Houston, Texas 77010
> Attorneys for Defendants, Arctic Slope Regional Corporation and
> Triquest-Puget Plastics, LLC
>
> Peter Blute
> 11601 Katy Freeway, Suite 101
> Houston, Texas 77079
> Attorneys for Defendants, Dana Corporation and Dana Engine
> Controls
>
> Wendy Smith
> Kirkpatrick & Lockhart, LLP
> Henry W. Oliver Building
> 535 Smithfield Street
> Pittsburgh, Pennsylvania 15222
> Attorneys for Defendant Chromalox, Inc.

by certified mail, return receipt requested, hand delivery, and/or facsimile transmission pursuant to the Federal Rules of Civil Procedure, on this the 8th day of April, 2002.

_____
Eduardo Roberto Rodriguez

26187.1

RUN DATE 04/08/02
RUN TIME 8:54 AM

PAGE: 01

2002-03-000933-E

MICROTHERM, INC, MAVID MAQUILADOR, S.A., ET AL.

VS

TRIQUEST-PUGET PLASTICS, L.L.C., ET AL.

* * * C L E R K ' S   E N T R I E S * * * *

(06)                                          03    05    02

BREACH OF CONTRACT                                        30.00

00521201                                      STEVE A.
STEVE A. BRYANT                               BRYANT& ASSOCIATES,
3618 MT. VERNON, SUITE A.
HOUSTON, TEXAS 77006 0000

00001402
EDUARDO ROBERTO RODRIGUEZ
P.O. BOX 2155
BROWNSVILLE TX.                               78520 0000

| | |
|---|---|
| 03/05/02 | ORIGINAL PETITION FILED |
| 03/05/02 | CITATION SEC. OF STATE: TRIQUEST-PUGET |
| | PLASTICS, L.L.C. |
| | SERVED: |
| 03/05/02 | CITATION SEC. OF STATE: ARCTIC SLOPE |
| | REGIONAL CORPORATION |
| | SERVED: |
| 03/05/02 | CITATION: EMERSON ELECTRIC CO. |
| | SERVED: 03/19/02    FILED: 04/05/02 |
| 03/05/02 | CITATION SEC. OF STATE: WIEGAND APPL |
| | DIV. OF EMERSON ELECTRIC CO |
| | SERVED: |
| 03/05/02 | CITATION SEC. OF STATE: CHROMALOX, INC. |
| | SERVED: |
| 03/05/02 | CITATION: DANA CORPORATION |
| | SERVED: 03/19/02    FILED: 04/05/02 |
| 03/05/02 | CITATION: DANA ENGINE CONTROLS |
| | SERVED: |
| 03/05/02 | JURY FEE: Pd. by STEVE A. BRYANT |
| 04/05/02 | ORIGINAL ANSWER: EMERSON ELECTRIC CO. |
| 04/05/02 | ORIGINAL ANSWER: WIEGAND APPL DIV. OF |
| | EMERSON ELECTRIC CO |
| 04/08/02 | ORIGINAL ANSWER: TRIQUEST-PUGET |
| | PLASTICS, L.L.C. |
| 04/08/02 | ORIGINAL ANSWER: ARTIC SLOPE REGIONAL |
| | CORPORATION |

ORIGINAL

FILED ___ O'CLOCK ___ M
AURORA DE LA GARZA DIST. CLERK

MAR - 5 2002

DISTRICT COURT OF CAMERON COUNTY, TEXAS

NO. 2002- _03 . 933 . E_

| | | |
|---|---|---|
| MICROTHERM, INC., ET AL | * | IN THE DISTRICT COURT OF |
| | * | |
| vs. | * | CAMERON COUNTY, TEXAS |
| | * | |
| TRIQUEST-PUGET PLASTICS, | * | _357th_ JUDICIAL DISTRICT |
| L.L.C., ET AL | * | |

## PLAINTIFFS' ORIGINAL PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

COME NOW MICROTHERM, INC. (*"MICROTHERM"*), MAVID MAQUILADORA (*"MAVID"*), AND DAVID E. SEITZ (*"SEITZ")*, INDIVIDUALLY, hereinafter collectively referred to as Plaintiffs, complaining of **TRIQUEST-PUGET PLASTICS, L.L.C., a subsidiary of ARCTIC SLOPE REGIOINAL CORPORATION**), ARCTIC SLOPE REGIONAL CORPORATION (*"ARCTIC SLOPE"*), EMERSON ELECTRIC CO. (*"EMERSON"*), WIEGAND APPLIANCE DIVISION OF EMERSON ELECTRIC CO. (*"WIEGAND"*), CHROMALOX®, INC., DANA CORPORATION (*"DANA CORP"*), DANA ENGINE CONTROLS *("DANA ENGINE")*, and would respectfully show unto the Court the following:

I.

## PARTIES

MICROTHERM, INC. is a Texas Corporation with its principal place of business in Harris, County, Texas.

MAVID MAQUILADOR, S.A. is a Mexican Corporation.

DAVID E. SEITZ, INDIVIDUALLY and as Licensor of Technology to other Plaintiffs, who resides in Montgomery County, TX.

Defendant TRIQUEST-PUGET PLASTICS, L.L.C., a subsidiary of Arctic Slope Regional corporation, is a foreign corporation or business entity that does not maintain a regular place of business in the State of Texas or a designated agent for service of process. Defendant has, however, engaged in business in the State of Texas and plaintiffs' claims arise out of defendant's acts of business within the State. Thus, defendant may be served with process by serving the Secretary of State, Elton Bomer, State Capital Building, P.O. Box 12697, Austin, Texas 78711-2697 to be forwarded to defendant at Arctic Slope Regional Corporation, P.O. Box 129, Barrow, Alaska 99723.

Defendant ARCTIC SLOPE REGIONAL CORPORATION is a foreign corporation or business entity that does not maintain a regular place of business in the State of Texas or a designated agent for service of process. Defendant has, however, engaged in business in the State of Texas and plaintiffs' claims arise out of defendant's acts of business within the State. Thus, defendant may be served with process by serving the Secretary of State, Elton Bomer, State Capital Building, P.O. Box 12697, Austin, Texas 78711-2697 to be forwarded to defendant at Arctic Slope Regional Corporation, P.O. Box 129, Barrow, Alaska 99723.

Defendant EMERSON ELECTRIC CO. is a foreign corporation doing business in Texas and can be served through its registered agent for service, CT Corp System, 350 N. St. Paul, Dallas, Texas 75201.

Defendant WIEGAND APPLIANCE DIVISION OF EMERSON ELECTRIC CO. is a foreign corporation or business entity that does not maintain a regular place of business in the State

2

of Texas or a designated agent for service of process. Defendant has, however, engaged in business in the State of Texas and plaintiffs' claims arise out of defendant's acts of business within the State. Thus, defendant may be served with process by serving the Secretary of State, Elton Bomer, State Capital Building, P.O. Box 12697, Austin, Texas 78711-2697 to be forwarded to defendant at 1199 County Road 9, P.O. Box 1439, Vernon, Alabama 35592.

Defendant CHROMALOX®, INC. is a foreign corporation or business entity that does not maintain a regular place of business in the State of Texas or a designated agent for service of process. Defendant has, however, engaged in business in the State of Texas and plaintiffs' claims arise out of defendant's acts of business within the State. Thus, defendant may be served with process by serving the Secretary of State, Elton Bomer, State Capital Building, P.O. Box 12697, Austin, Texas 78711-2697 to be forwarded to defendant at 103 Gamma Drive Extension, Pittsburgh, Pennsylvania 15238.

Defendant DANA CORPORATION is a foreign corporation doing business in Texas and can be served by serving its registered agent, CT Corp System, 350 N. St. Paul, Dallas, Texas 75201.

Defendant DANA ENGINE CONTROLS is a foreign corporation with offices in Brownsville, Texas. Defendant can be served by serving its registered agent, CT Corp System, 350 N. St. Paul, Dallas, Texas 75201.

Discovery is to be conducted under Level 3 of the Texas Rules of Civil Procedure.

## II.

## JURISDICTION

The court has jurisdiction over Defendant TRIQUEST-PUGET PLASTICS, L.L.C., a subsidiary of Arctic Slope Regional Corporation, a foreign corporation, organized and existing under the laws of the State of Alaska, because it has done business in Texas and has continuing contacts with Texas and is amenable to service by a Texas court. The court has jurisdiction over the controversy because the damages are within the jurisdictional limits of the court.

The court has jurisdiction over Defendant ARCTIC SLOPE REGIONAL CORPORATION, a foreign corporation, organized and existing under the laws of the State of Alaska, because it has done business in Texas and has continuing contacts with Texas and is amenable to service by a Texas court. The court has jurisdiction over this matter because the damages are within the jurisdictional limits of the court.

The court has jurisdiction over Defendant EMERSON ELECTRIC CO., a foreign corporation, organized and existing under the laws of the State of Missouri, because it has done business in Texas and has continuing contacts with Texas and is amenable to service by a Texas court. The court has jurisdiction over this matter because the damages are within the jurisdictional limits of the court.

The court has jurisdiction over Defendant WIEGAND APPLIANCE DIVISION OF EMERSON ELECTRIC CO., a foreign corporation, organized and existing under the laws of the State of Alabama, because it has done business in Texas and has continuing contacts with Texas and is amenable to service by a Texas court. The court has jurisdiction over the controversy because the damages are within the jurisdictional limits of the court.

4

The court has jurisdiction over Defendant CHROMALOX®, a foreign corporation, organized and existing under the laws of the State of Pennsylvania, because it has done business in Texas and has continuing contacts with Texas and is amenable to service by a Texas court. The court has jurisdiction over this matter because the damages are within the jurisdictional limits of the court.

The court has jurisdiction over Defendant DANA CORPORATION, a foreign corporation, organized and existing under the laws of the State of Ohio, because it has done business in Texas and has continuing contacts with Texas and is amenable to service by a Texas court. The court has jurisdiction over the controversy because the damages are within the jurisdictional limits of the court.

The court has jurisdiction over Defendant DANA ENGINE CONTROLS because it has done business in Texas and has continuing contacts with Texas and is amenable to service by a Texas court. The court has jurisdiction over the controversy because the damages are within the jurisdictional limits of the court.

III.

## VENUE

Venue is proper in Cameron County, Texas, pursuant to Texas Civil Practice & Remedies Code §15.002a(1) & (3).

IV.

## BACKGROUND

Plaintiffs in this case are Licensee's under patents for the SEISCO® electronically controlled tankless water heater. It is believed that this type product will some day replace the conventional water heaters found in homes today. Plaintiffs wanted to manufacture these water heater products and to sell them to the building industry including manufactured homes. Anyone who purchases and uses a water heater has generally enjoyed very reliable performance, therefore the expectation of any customer for his or his client's water heater is very high. Reliability results from good design, and good manufacturing with reliable component parts. Three of the most critical components in Plaintiffs' electronically controlled water heater are (1) the heating elements, (2) the temperature sensors that provide very important water temperature information necessary for safe and reliable performance, and (3) heating chambers (heat exchanger) which are made from high performance engineering plastics. If the screw plug of heating elements used in any water heater cracked and leaked water, or the temperature sensors were defective and shortly after installation gave bad temperature readings to the heater's control, or a high percentage of the heat exchangers of a water heater failed within the first year by cracking and leaking water customers of the manufacturer of the water heater would loose confidence and refuse to purchase his product. In fact, any one of these kinds of failures in the products of a single water heater manufacturer would cause his. If that same manufacturer had all these failure problems with his water heater he could not for long stay in business. Obviously, these critical components need to be suitable for their application, free of manufacturing defects in order to provide reliable performance and

reasonable service life under the normal conditions experienced by "tankless on demand water" heaters.

Plaintiffs would show this Honorable Court that they had developed a genuine sense of trust in their relationship with Defendants.

Plaintiffs would show this honorable court that between the years of 1999 and 2001 each of the Defendants individually were vendors to Plaintiffs and each represented themselves to said Plaintiffs

    1.      to be leading manufacturers in their fields;

    2.      with extensive experience and expertise in the design and manufacture of their respective products;

Plaintiffs would show this Honorable Court that Defendants Triquest-Puget Plastics, L.L.c, a subsidiary of Arctic Slope Regional Corporation, all molders were experts in the

    1.      selection and utilization of injection molding equipment suitable for properly molding Plaintiffs' water heater parts;

    2.      development of processing parameters to insure the best and strongest part;

    3.      design tooling changes to improve the utilization of Plaintiffs molds and processing parameters;

    4.      evaluation of toolmakers;

    5.      review of tooling modifications during manufacture;

    6.      approval of finished tooling;

    7.      processing Defendants' selected engineering resin material into final parts;

    8.      evaluation of the processing parameters to insure optimum part strength and integrity;

    9.      assurance of a part quality and quality control;

10.    maintenance of its customer tooling in a first class condition;

Plaintiffs will further show that Defendants Triquest-Puget Plastics, L.L.C., a subsidiary of

Arctic Slope Regional Corporation, all molders/plastics owned did

1.    recommend tooling changes for Plaintiffs heating chamber mold that were represented to improve the performance of the mold and allow the mold to be used in smaller molding machines to reduce the overall cost of molding;

2.    assured Plaintiffs that such tooling work was to be performed by Taller Mendoza;

3.    agreed to take ownership of these tooling modifications and guarantee their ultimate performance;

Plaintiffs will show that Defendant Emerson Electric, Wiegand Appliances and Chromalox,

1.    represented themselves to Plaintiffs as the leading independent manufacturer of very high quality heating elements for appliances in the U.S.

2.    experts in the evaluation of heating elements in various applications;

3.    experts in the recommendation of the type and specifications for heating elements for fluid heating applications;

4.    recommended that Plaintiffs change the type of heating element used from one with a plated steel screw plug to a solid brass screw plug in order to provide better long term performance in aggressive water conditions and to prevent corrosion;

5.    charged Plaintiffs substantially more for what Defendants represented as a much superior heating element screw plug;

Plaintiffs will show that Defendant Dana Corporation and Dana Engine Control

1.    held itself out to be recognized as a global leader in the design and manufacture of temperature sensing devices;

2.    represented its devices were manufactured in a quality and workmanlike manner

3.    their temperature sensing devices, (thermistors) as used by Plaintiffs are suitable and reliable for demanding temperature measurements of water;

8

As Defendants are all recognized as major leaders in their respective fields, Plaintiffs were very comfortable in following their recommendations and using their products or services. Defendants, after gaining the confidence of Plaintiffs, recommended their own respective products and/or services initially and continued to recommend them and represent them as suitable for Plaintiffs application, even after Defendants were provided with failed parts and knew or should have known, not only that the reasons for the failures were their own manufacturing processes, but also knew the immediate remedy. Defendants either pleaded ignorant to the problems or blamed the failures on extraordinary circumstances including their own vendors and assured Plaintiffs with each new lot of product that the failures were not likely to reoccur.

In July of 1999, Plaintiffs were introducing their new microprocessor controlled version of the tankless water heater. This is a very sophisticated product and relies heavily on quality parts and it was just after this introduction that Plaintiffs began to receive parts for Defendants that had concealed manufacturing defects.

Plaintiffs would show that the first problem began with special heating elements provided by Defendant Chromalox, a division of Wiegand Appliances, a wholly owned subsidiary of the Emerson Electric Company. Defendants had induced Plaintiffs to change over to a much more expensive immersion heating element with a solid brass screw plug. Very shortly thereafter Plaintiffs who were pressure testing every element purchased began discovering a small percentage of brand new elements in their shipping boxes whose screw plugs had cracked. When David Seitz, President of Microtherm, Inc. contacted Mr. Dick Feather presenting him with the problem and providing him with samples, he was told that this problem occurred because Chromalox had been sold a quantity of bad brass screw plugs. Mr. Feather indicated that Chromalox had resolved the

issue and there shouldn't be any more problems. Neither Feather or anyone else at Chromalox had contacted Plaintiffs to advise them prior to this time that Chromalox had a potential problem with parts it sold Plaintiffs. Shortly thereafter Mr. James Albert, the Q.C. manager for a sub contractor for Plaintiffs received a letter from Chromalox indicating the problem was a manufacturing issue at the Chromalox facility involving over-stressing the part by over staking the screw plug upon installation of the heating coil. When asked about this issue by Seitz on or about August of 1999, Mr. Feather continued to insist that the problem was the total result of bad brass purchased in the past and that the problem was resolved. Furthermore Feather indicated that Chromalox was making a very strong effort in improving its own quality control over the brass materials it was purchasing to insure this did not happen again. Feather confirmed what Plaintiffs were later to find out. The defects in the brass, whether over-stressing or quality of brass is concealed and very hard if not impossible to detect without destructive testing. Plaintiffs had to rely on Defendants expertise and representations that the problems were resolved. The failures did continue, however, albeit their were smaller quantities of failures in the newly delivered parts. The failures in actual water heaters installed during this 1999 period were very small. From that point on lots were tracked by date along with failures in the field. Failures from installed water heaters started to increase late in the year 1999 from parts with latent stress defects but Chromalox continued to blame these failures on alleged same limited bad batch of brass screw plugs. Chromalox represented to Plaintiffs that it had changed over to making the brass screw plugs themselves rather than buying them from outside vendors and that they would be able to control quality and prevent these types of product defects. When failures continued to occur in different lots of heating elements, Feather represented that these were probably made from the same material. Then

10

suddenly the products delivered to plaintiff by these defendants no longer experienced cracking. Plaintiffs were then told that the staking process had been slightly modified and that was insuring better parts. Chromalox had manufactured elements for month after month for over 6 months that continually had failures and was able to stop the problem with a single manufacturing change. Plaintiffs have since discovered that such staking issues are commonly known to the manufacturers of heating elements and that procedures and manufacturing specifications for staking have been developed and used to prevent this very type of problem.

The Dana Corporation and its wholly owned subsidiary Dana Engine Control purchased a company or companies which had previously sold temperature sensors to Microtherm, Inc. or its predecessor Therm-O-Lator Inc. The Dana Corporation is a large publicly held company which specializes in automobile parts. The temperature sensors purchased by Plaintiffs were a type commonly used in the engine blocks of cars to report engine water temperature. These devices had to be reliable and suitable for the very demanding application in which they were used. It was because of the long history of reliable use that Plaintiffs felt confident in the Dana temperature sensors for its water heater. The temperature curves for use in an automobile and that of Plaintiffs water heater were very similar. Dana had up until December of 1999 manufactured the sensors sold to Plaintiffs in Alabama. On or about December of 1999, Defendant Dana Corporation moved its manufacturing from Alabama to Brownsville, Texas and Matamoros, Mexico just west of the Gulf of Mexico.

On or about June of 2000, Plaintiffs began observing problems with incoming temperature sensor parts. Some would check out fine on incoming Q.C. then fail upon system checking the heater. The numbers of these failures were small but Plaintiffs engineer David Berryhill reported

11

the problem and Plaintiffs subcontractor's engineer Juan Carlos Cabello also discussed his findings with a Mexican engineering firm, which was working with Dana. A plant engineer had indicated to Juan Carlos that there had been some contamination problems in earlier lots and perhaps Plaintiffs had received a few of these. For the balance of the year, increasing problems were occurring with installed heaters, which Plaintiffs originally believed were probably due to control board failures. Control boards were replaced, even heaters, and from about October of 1999 through January of 2001 there was increasing evidence that the failures were caused by the defective temperature sensors. Then in January the Dana engineers disclosed that the temperature sensing devices were in fact contaminated. Plaintiffs did not know what "contamination" meant as it applied to the sensors but Dana's representatives continued to assure Plaintiffs that the problem was small and isolated to earlier lots and that they had truly resolved the problems. By January of 2001, the failures were occurring at an alarming rate. On or about March of 2001, Plaintiffs sent parts to outside experts to evaluate failed parts and discovered that the entire inside of the brass enclosed sensor assembly was corroding to the point that it looked like the parts had been soaked in salt water. Plaintiffs stopped paying for the parts and contacted Defendant Dana Engine Control both in Alabama and in Brownsville, Texas.

On or about September of 1999, after having minor tooling modifications made to a large heating chamber mold, Plaintiffs were considering two molders for the job of producing plastic parts for Plaintiffs newly improved tankless water heater. Plaintiffs interviewed Supreme Plastics out of Gladewater, Texas and were contacted by a representative of Puget Plastics for their Guadalajara molding facility. Puget was at that time an extremely well respected molder and had built a multimillion dollar state of the art facility in Guadalajara, Mexico to service the

12

requirements for Hewlett Packards' Mexico manufacturing. Plaintiffs were assured that Puget in Guadalajara was looking for diversified molding applications and Plaintiffs product was of particular interest to them. They represented that they were using their own staff of experts from their Tualalitin, Oregon facility and that every contract or obligation that involved molding in Guadalajara was in fact not only considered made but fully guaranteed by Puget Plastics, Tualatin and its owners Arctic Slope. This point was stressed and reinforced by demonstrating that the employees and management at the Guadalajara facility did not change their business cards which reflected their addresses as being Puget Plastics in Tualatin. Plaintiffs agreed to Defendants request to send Plaintiffs molds at considerable expense to Guadalajara to enable Defendants to properly survey the condition of Plaintiffs molds and processing requirements. After the molds were delivered Defendants had Plaintiffs molds surveyed and carefully checked. Defendant Puget Plasitcs advised Plaintiffs that they wanted the opportunity to have Plaintiffs business and would handle the account in a very special manner.

Plaintiffs had, over the years, worked with and developed a high level of confidence with Tony Mendoza, of Taller Mendoza in Guadalajara. Seitz was told that Puget had entered into a partnership with Taller Mendoza for mold repairs and mold manufacture. Mendoza told Seitz that his involvement with Puget was related to tooling support, and while his company had no relationship in Puget's molding operation, it was his understanding that Puget was doing a good job in its molding operations for major U.S. companies.

On or about December of 1999, the mold that makes the chamber parts for the Seisco water heater was sent to Puget. On January 28, 2000 a meeting was called by Andre Saverlieff, (Andre), Puget's Plant Manager for the purpose of concluding agreements between Puget and

13

Plaintiffs so that he could schedule Puget's production of all the plastic parts required by Plaintiff for the Seisco® water heater. Seitz made a special trip from Houston, TX, at Andre's request, to attend the meeting.

At the meeting, Seitz provided Puget with set-up and sequence information in an attempt to insure the safe operation of the chamber mold. Seitz provided and signed off on sample "QC" parts.

During this January 28 meeting, Seitz explained that Mavid's technicians were not plastic experts but rather contract manufacturers for the Plaintiffs. Seitz confirmed to Andre that Microtherm, Inc. a Texas Corporation was fully responsible for all P.O.'s for materials molded, as well as the materials provided. Seitz made it clear that given the circumstances and based on his reliance for tooling support from Defendant Puget's joint venture with Mendoza, Plaintiffs were willing to have Puget mold the parts. Seitz made it clear that he was absolutely relying on Puget to conscientiously perform its molding to insure quality parts. Seitz emphasized the fact that these parts were to be used in water heaters for residential use and that no one could afford to have inferior plastic parts crack in this application. Seitz was again reassured by Andre that Puget Plastics of Tualatin, had a history of quality or they could not mold for companies like Boeing and H.P. Furthermore it was represented that Puget in Guadalajara was part of and the same as the Puget Plastics Company of Tualatin, both being owned and controlled by Arctic Slope. In this case, Puget Plastics of Tualatin was in immediate control, and along with Arctic Slope stood behind all the commitments, and work performed by Puget's Guadalajara plant. He stated "It's for that reason my business card and that of others here shows our address as the Corporate offices in Oregon."

14

The chamber mold was installed in a Puget machine on or about 2/1/00 but within just a few hours the mold was damaged as a result of improper operation. By 2/15/01 Puget, however, had delivered over 1,800 chamber parts. Then between the period of 2/15/01 and 5/8/00 Puget as a result of absolute negligence crashed and damaged this mold 4 more times, and was unable to timely deliver parts to Mavid for Plaintiffs' water heater requirements. In one such case a night supervisor had deliberately disabled a safety switch. Each time the mold was damaged, Puget's Andre Savelieff assured Seitz that they would fix the tool and correct the problem. This process soon became a loop that Seitz felt Plaintiffs could not free themselves from without greater serious financial harm.

Much of the tool damage to the chamber mold resulted from Puget's inability or refusal to maintain proper and safe operation of a small side core that made a hole horizontally between the two chambers of the chamber part. During operation this core had to be inserted into the side of two larger cores and then removed. If the large cores were not properly set or if the operator tried to lower the large cores before removing the side core the cores would crash against one another causing significant damage.

Seitz soon discovered that Puget had modified the main cores cutting off the solid end and replacing them with sacrificial inserts. If the mold was improperly operated the end would break off and they would only replace that part. This was done without Seitz's or Microtherm's approval.

Seitz was upset with this approach, as it did no't attempt to maintain safe operations which prevent the reasons for the problem but rather only to reduce the damage. Seitz also observed very poor processing conditions by Chuck Fletcher the manager for material processing

for Puget. Seitz discovered that Chuck was not properly drying material and in one case was knowingly trying to operate a machine with a heater band on the barrel inoperative. Chuck lied and was found out as soon as the band was checked with an amp meter and the material was checked for moisture.

Andre had required Fletcher to personally apologize to Seitz and convinced Seitz that he would personally make sure that Fletcher did things right. It was discovered later that from that day forward there was a succession of events resulting from conditions which Fletcher allowed or knowingly created causing damage to the molds or poor product quality.

Seitz had sent David Berryhill, a mechanical engineer to Guadalajara in May to meet with Chuck Fletcher, Puget's process manager, and Tony Mendoza to discuss possible additional tooling modifications that could possibly reduce or eliminate the potential for continuing damage and allow Puget to operate the mold in a smaller machine.

Puget then recommended that Plaintiffs allow Puget to install a mechanical slider in lieu of a piston operated side core. Puget represented that this modification would eliminate the opportunity for operator error in the proper timing when moving this core, which had to enter and leave the top part. Seitz spoke with Mendoza and was assured that such a modification could be properly done and should relieve the potential problem. This was a major modification because once it had been done, substantial changes would be made to the mold such that it would be extremely difficult and very expensive to try to return to the original design. For that reason Plaintiffs wanted no one but Mendoza to do the work. Puget agreed and represented that this modification would be performed by Mendoza.

Additionally Puget recommended that the main core piston assembly be modified to reduce the height requirements. According to Puget this would allow them to install the chamber mold in a smaller machine which would allow them to provide lower costs per part to Plaintiffs.

Plaintiffs agreed to both modifications asking only that Mendoza complete the work as Puget had represented on a staggered schedule with the slider modification to be completed by the first week of May (6 weeks).

It was in fact not until after 5/15 that the tool with this modification was delivered to Puget. The mold was installed and operated for less than 4 hours when the new slider broke. It was then that Seitz, believing that Mendoza had not done the modifications, discovered in fact that Puget had lied to him and taken the work to a company called Tooling Science a shop next door to Puget's plant. The assembly was poorly designed and each time the mold closed the slider was forced into a bind preventing the proper insertion of the side core. From 2/15/00 to 5/30/00 because of continuing tool problems related to this modification Puget failed to deliver a single chamber part to Mavid. Then on 5/31/00 Puget started delivering partial shipments between repeated breakdowns of the slider.

Plaintiffs were now experiencing his worst nightmare. This tool could not be changed back without a great deal of time and expense, Plaintiffs were deprived of parts contracted for by Puget and had to continue to rely on more of Puget's assurances that they would correct the problem. Seitz called Mendoza and insisted that he take responsibility for making sure that the issue was corrected. As it turned out, Puget finally discovered that the mold modification had been made in such a crude manner and without proper supervision that the slider base was offset. When the mold closed the opposing side of the mold actually acted as a wedge forcing the whole

assembly upwards. This caused the core to try and enter the mold at an improper angle, galling it and finally it bent and then broke the assembly's attachment bolts. Puget used a grinder to cut away the excess and Mendoza made new cores, which temporarily resolved this issue.

Puget had still not disclosed an even greater concern. This arose from the use of a molding machine having a very large material capacity. Because of this large capacity in relationship to the parts requirement and the molding time per part, substantial excess material had to stay in the hot barrel (oven) for a long time. If proper molding temperatures were maintained, this material would burn and degrade. This degradation would be so apparent that any such part would have been rejected. For this reason, Puget's Fletcher had reduced the molding temperatures 100°F. below DuPont's recommended molding temperatures. The lower temperature eliminated the degradation in the barrel but created a condition in which cooler material was being forced around the core and when the flow of material met it was not sufficiently fluid to properly bind (weld). By molding at these temperatures he was able to mold parts that had every appearance of good parts but in fact were significantly weakened at the areas where the material met after flowing around the cores. (weld lines or joints). In addition, there is evidence that many parts were molded when the mold was leaking oil. Without microscopic structural analysis, this type of weakness would not be visible. On the other hand any experienced molder knows, as those involved at Puget had to have known, one of the inherent problems with cold molding is poor weld line strength and increased molded in stress.

Seitz traveled to Guadalajara again the end of June, and at that time discovered that Puget had wasted and/or destroyed substantial quantities of the plastic resin materials that had been furnished to Puget by Plaintiffs. Plaintiffs were entitled to have received credits against Puget's

18

invoices to Mavid for materials furnished. As it turned out substantial amounts of material were wasted during improper molding or destroyed by Puget's mishandling of the material. Plaintiffs insisted on an accounting and proper credit.

Subcontractor Mavid continued to offer assistance and people to attend molding operations and to the extent of their limited experience provide helpful instructions to the Puget Q.C. staff. Puget not only refused such offers but on or about the last week of June 2000, Chuck Fletcher not only refused to permit any help but actually terminated all production for Mavid/Microtherm because James Albert, a QC manager for Mavid discussed part quality with a Puget Q.C. person.

This shutdown was a last straw. Seitz sent a letter styled "Formal Notice and Demand" reiterating the terrible losses that Microtherm/Mavid were having to suffer from Puget's breach of contract, and misrepresentation. In this letter Plaintiffs again demanded an accounting and credit from Puget for wasted or destroyed material.

Dale Behm, President of Puget Plastics Corporation responded on 7/3/00 with a promise to have Andre Savelieff as Puget's representative make sure that the issues are properly resolved.

Andre and Seitz met in Guadalajara on July 4th to discuss the issues. From that meeting Plaintiffs and Defendants came to an agreement in principle that appropriate credits from Puget would be given and that Plaintiffs would allow Puget to employ Mendoza to change the main piston core assembly in order to reduce the length of the mold and allow Puget to mold the chamber parts in a smaller machine more cost effectively. At this time Puget had still not disclosed the fact that they were molding these parts in improper equipment, in an improper manner at improper temperatures.

On August 28, 2000, Plaintiffs discovered that Andre had left the position of Plant Manager and returned to Oregon, and that critical plastic parts had still not been manufactured and delivered to Mavid. Seitz personally made arrangements to travel to Guadalajara for a special meeting with the new plant manager, Tony Lueke. When Seitz arrived in Guadalajara he was advised that Lueke had decided not to show.

After returning to Houston Seitz wrote Behm an e-mail advising of this incident and the fact that Seitz had just discovered that Monday, the 28th of August in a meeting with Mendoza, that the mold modifications approved by Plaintiffs, with respect to the main piston assembly, had never been started.

Behm responded personally on Sept 1, 2000. He assured Seitz the "Andre will stay involved and assist me in solving the issue."

Seitz replied the same day to Behm's e-mail and expressed a grave concern over Puget's continued default. Seitz advised Behm that Plaintiffs were holding Puget responsible from that date forward for the losses incurred.

Plaintiffs were in the worst of situations with the principle mold undergoing long overdue modifications under Puget's supervision with a completion date uncertain, coupled with the continued default of Puget to provide Plaintiffs desperately needed parts for which they contracted.

On September 1, 2000 Seitz faxed to Behm his understanding of their agreement to move forward. Seitz again advised Behm that Plaintiffs continued to rely on Puget for performance and asked Behm to advise Seitz if this letter did not contain what was also Puget's understanding of the agreement.

20

On or about September 14, 2000 Seitz accompanied by a representative of DUPONT, traveled to Guadalajara.. Seitz had agreed to meet with Andre, Tony Luethe of Puget and Tony Mendoza of Taller Mendoza to discuss the tooling issues and the accounting of Microtherm's outstanding balance after credits due from Puget. First the meeting included a discussion of tooling and Mendoza provided Seitz with an updated estimate of expense for the modification required to redesign the main core piston assembly and a time for completion. Mendoza and Luethe confirmed that Mendoza's shop would do the design and work. Luethe and Seitz dismissed themselves to a side office and discussed Plaintiffs' account balance. Luethe disclosed to Seitz that he was very much aware that substantial credit was owed to Plaintiffs and that when these were given there would no balance owing to Puget for past work. Luethe further advised Seitz that he was also aware of the wasted and destroyed materials and in fact on one of his visits he personally observed a forklift operator, at the unloading dock, run his fork lift into a pallet full of Plaintiffs' very expensive Radel resin and tear bags causing the resin to be discharged all over the driveway. Luethe promised and assured Seitz that the future would be different and that Puget sincerely wanted to be the molder for the Seisco parts.

After this discussion Seitz and Hines were escorted to the molding area at which time Fletcher and an engineer for DuPont were in heated discussion over molding temperatures for one of the Zytel parts. Puget was molding at almost 100 degrees F below DuPont's recommended process temperatures. Fletcher was arguing that the DuPont recommendations were only guidelines and that in fact good parts could be obtained at these low process temperatures. Seitz was appalled and deeply concerned, expressing his concerns. The very next day Seitz asked to be provided the molding parameters for all the tools including the chamber

tooling. This is the first time that the Plaintiffs' found out that Puget was circumventing the letter and intent of Dupont's processing guidelines for the DuPont Zytel material.

Fletcher and Luethe continued to argue that good parts could be made even under these conditions. Nevertheless Seitz was concerned and reiterated that while he was not a processing expert that Puget needed to be reminded that these parts needed to be very high quality as they were water heater parts, which would be installed in customers' homes.

Luethe explained that he was a processing expert and continued to contend the parts were fine.

Plaintiffs had been assured the tooling modifications from Mendoza would be completed no later than September 25th. Then to Seitz's surprise, on Friday September 22 only three days before "Mendoza" was supposed to complete the modifications, Seitz again discovered that the very important work was not being done by Mendoza, in fact not even designed by Mendoza but rather by the same shop next to Puget's plant. Seitz was extremely concerned and insisted that Puget coordinate the initial evaluation of the tool performance with the modifications be scheduled with Mr. Joe Rebollo, a DuPont engineer, so that he or his representative could attend.

On October 6th, after continued delay Puget on its own decided to run the chamber mold at night, a time when Mr. Joe Rebollo from DuPont could obviously not attend. James Albert, Mavid's QC manager found serious quality problems with the initial parts. Seitz then received a message from Agustin, an employee of Puget, that Puget had run 10 more parts and unless we were prepared to accept the quality of these parts that Puget would take the mold down and not run production. Those specially picked 10 parts appeared acceptable to James. What James and Seitz did not realize was that the new modifications so long awaited did nothing to solve the

problem. James was not aware of nor qualified to understand that while Puget had changed machines, they did so deliberately to deceive Plaintiffs. They were still using a very large machine, which had only slightly less resin capacity than the original. Puget discovered that the designs for both of the modifications to the mold that they had supervised were not curing the problems. The first modification for the slider was weak and broke within hours of the first production and continued to fail. Furthermore the second modification to the main cores piston assembly added additional width, which gave rise to an entirely different problem for Plaintiffs. A molding machine has two absolute dimensions that being the height from the nozzle to either the floor or in the case of Puget's machines a cross member which inhibited the use of full height and the width of the tie bars for the platen. Puget had reduced the height of the mold but increased the width such that it not only did not fit between the tie bars for Puget's smaller machines but would also prevent Plaintiffs from using the mold in other types (makes) of machines which otherwise would have accommodated the mold's original height.

Puget deceived Plaintiffs from day one about having an available machine that had a suitable resin capacity plus clamp tonnage capacity in which the chamber mold could have been used.

As stated above no sooner had Puget began to try and run parts with the newly modified mold but it broke again. This time it was sent to Mendoza for repairs. Mavid got only 278 parts for chambers after 2.5 months of waiting. Mavid's production was and had been shut down off and on for over a month and now October 2000 Plaintiffs product was completely shut down again.

The mold was reinstalled and production was being run Saturday the 14th of October.

James Albert the QC manager for Mavid was at Puget observing this process. Seitz contacted James on his cell phone and asked him to get the mold process temperature parameters from the supervisor. The supervisor would not initially give them to James. Seitz then asked him to go to the machine and write down the temperatures. The next day on Sunday, James had an opportunity to view and record process temperatures of about 460 degrees F. These were the same as used before the modification. Seitz insisted that James find out why they were still processing like this. James was able to get this information within a few minutes. James advised Seitz that he was informed by a Puget supervisor from Tualatin that contrary to all the assurances Puget could not use the mold in a smaller machine because of the new width and in fact did not have a machine with proper resin capacity available at that time anyway.

Seitz was in disbelief. He had been told by Luethe that the reason for running at lower temperatures was the viscosity of the DuPont materials. Luethe and everyone else at Puget claimed they were using the hot oil mold temperature control during the processing. Even this was a lie.

That Sunday, October 15, 2000, Luethe was off again on another vacation in Oregon. Seitz e-mailed Luethe and asked him to call him and provide an immediate explanation for what was a series of misrepresentations to Seitz.

Luethe did not call and refused to accept Seitz's calls even after he returned to Guadalajara. Seitz was told by James and Marco Hernandez of Mavid that Puget intended to resume molding that week on Thursday or Friday.

After no further communications, on Friday night October 20, 2000, at about 7:00 pm, Seitz received a call at his residence from Luethe advising him that Puget had made a decision to

take the chamber mold down and refused to mold the Plaintiffs plastic part requirements.

During the period of time from January 2, 2000 to October 31, 2001, purchase orders for 5,100 chamber parts alone were issued. These purchase orders were accepted by Puget. Puget delivered 4,329 parts that were in great part reluctantly accepted because of the great need. Almost 20% of all parts received were rejected. The 671 parts not delivered plus the replacement of at least 800 rejected parts would have made over 730 four chamber water heaters or at least 2 ½ months requirements.

This is not the whole story. Because of the defaults of Puget, delays were incurred during the time when modifications of the tooling were allegedly being made. This down time as it turns out was completely unnecessary. Plaintiffs lost at least 3 months each of production, hundreds of sales and sales opportunities, the dead expense of maintaining their respective operations. Since plaintiffs Industriales and Microtherm are responsible for all the Mavid funding, the expense, as puget was already aware, was totally that of these two Plaintiffs. The combined expense exceeded $200,000, not counting any loss of sales or the loss of customers, and the extremely high warranty replacement and service cost for heaters which failed from cracked plastic parts molded by Puget.

From January 2001 until the present, there have been well over 200 failures of water heaters increasing at a current rate of over 40 per month. These failures are the direct result of weak weld lines I the heating element boss. This type failure has not been seen in any other parts molded since 1995 except for the Puget molded parts and for six parts molded in January of 2001. In the case of these six part, there was a small and very short lived contamination from leaking oil in the mold.

A great many important customers have been lost and innumerable other poatential customers as a result of a loss of confidence in the Seisco water heater resulting from these failures. Included in a HUD owned housing authority project in Alabama in which all 66 heaters are being replaced. All failed from cracked chamber parts molded by Puget. Plaintiffs' product was recommended to the housing group and installation in part subsidized by the TVA and a great many builders in the Virginia and Maryland areas.

Plaintiffs have invested a great deal of money in developing the TVA relationship, as well as that of the builders in Virginia and Maryland, and the manufactured housing market. The loss of confidence has truly cost plaintiffs dearly.

Based on representations made by Defendants and their agents, Plaintiffs materially altered their position and focused solely on Defendants for materials, and technical support. As a result of this reliance on Defendants' false representations and promises, Plaintiffs were damaged by expending substantial amounts of money with Defendants defective products and/or services and by losing years of time in their attempts to complete the development, commencement of production and sales of their product. In addition, Plaintiffs have expended large sums of money in mitigating their damages and effectuating "cover" as defined in the Tex. Bus. & Comm. Code.

## V.

## BREACH OF CONTRACT

All of the allegations heretofore set out are incorporated herein for all purposes.

Plaintiffs and Defendants Arctic Slope and Puget Plastics were parties to legally binding agreements. Upon trial hereof, it will be shown that Defendants breached their part of the agreement in at least the following particulars:

1.   Failing to provide necessary technical support required for the successful manufacture of Plaintiffs product.

2.   Failing to provide guidance in materials selections but in fact misleading Plaintiffs.

3.   Providing Plaintiffs with misleading and false representations (or inferior recommendations) with respect to Plaintiffs' tooling modifications.

4.   Providing Plaintiffs with misleading (or inferior) representations related to the level of Puget's technical review and evaluation of Plaintiffs' design, parts and tooling.

6.   Defendants' failure to provide Plaintiffs' with recommendations of alternate materials which in fact would have been more suitable for Plaintiffs application and intended use.

7.   Misrepresenting the suitability of parts manufactured for Plaintiffs' product.

8.   Misrepresenting the nature, quality and extent of services that would be provided.

9.   Failing to perform all those matters set forth in paragraph II of this petition. Such allegations are incorporated herein by reference.

In addition to its right to bring this action under common law principles, Plaintiffs would show that the acts and omissions heretofore set forth violate Article 2 of the Uniform Commercial Code as adopted by Texas in the Texas Business & Commerce Code. In addition to all other rights and remedies for breach of contract, Plaintiffs would show that they are entitled to recover those statutory remedies set forth in the Texas Business & Commerce Code.

As a cause of Defendants' breach of contract and violation of Article 2 U.C.C., as adopted by Texas, Plaintiffs have suffered damages as hereinafter set forth.

VI.

## DECEPTIVE TRADE PRACTICES

All of the allegations heretofore set out are incorporated herein for all purposes.

27

All Plaintiffs have complied with all conditions precedent to the recovery of damages under the Texas Deceptive Trade Practices Act. Upon trial hereof it will be shown that Defendants violated the Texas Deceptive Trade Practices Act in the following particulars:

1. Falsely representing certain products marketed and manufactured by Defendant were suitable for Plaintiffs' application.

2. In causing Plaintiffs to continue expending money and time on service and repairs when Defendants knew or should have known that the products they provided, were defective and would fail in Plaintiffs water heater application.

4. Representing that Defendants would provide those services, support, and assistance outlined in paragraph II of this amended petition when they had no intention of providing those services or, alternatively, the degree or qualify of services promises.

Defendants conduct was committed intentionally and knowingly. The conduct of Defendants violates the Deceptive Trade Practices Act in the following particulars:

a) causing confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services (§17.46(b)(2));

b) representing that goods or services are of a particular standard, quality or grad, or that goods are of a particular style or model, if they are of another (§17.46(b)(7));

c) disparaging the goods, services, or business of another by false or misleading representation of facts (§17.46(b)(8));

d) knowingly making false or misleading statements of fact concerning the need for parts, replacement, or repair service (§17.46(b)(13);

e) the failure to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed (§17.46(b)(23);

f) engaging in an unconscionable action or course of action as defined in §17.45 Tex. Bus. & Comm. Code; §17.50;

28

k)    breaching express and implied warranties.   §17.50 Tex. Bus. & Comm. Code.

As a proximate cause or, in the alternative, a producing cause of the conduct set forth above, Plaintiffs have suffered damages as hereinafter described.

## VII.

## FRAUD AND MISREPRESENTATION

All of the allegations heretofore set out are incorporated herein for all purposes.

During the course of Plaintiffs' dealings with Defendants, Defendants made many statements of material fact which they knew to be false when made or were made without regard and/or without knowledge of their truth or falsity, or, alternatively, were negligently made.  Such statements were made for the purpose of inducing Plaintiffs to act or refrain from acting and Plaintiffs relied on such misrepresentations to their detriment.  In addition to false representations, Defendants made statements that were literally true which were used to create a false impression. At all material times hereto, Defendants had a duty to speak and their mere silence is equivalent to a false representation.   Defendants committed fraud and misrepresentation in the following particulars:

1.    representing that products were manufactured in a good and workmanlike manner free of known defects.

2.    representing that such defective parts were suitable components for Plaintiffs' application;

3.    failing to advise Plaintiffs of testing that had been conducted by Defendants which revealed that parts that were being sold and delivered to Plaintiffs had concealed manufacturing defects and not suitable for Plaintiffs' application;

4.    deliberately concealing manufacturing defects by blaming others for failures of Defendants.products;

29

As a result of Defendants' fraud and misrepresentations, Plaintiffs have suffered damages as hereinafter described.

## VIII.

## NEGLIGENCE

All of the allegations heretofore set out are incorporated herein for all purposes.

Upon trial hereof, it will be shown that Defendants were negligent and such negligence was a proximate cause of Plaintiffs' injuries and damages. Defendants were negligent in the following:

a)   in failing to properly test its products;

b)   in failing to follow prudent manufacturing guidelines and specfications

c)   in making false representations and engaging in those acts and omissions described in paragraph VI of this petition;

d)   in providing the services it agreed to perform as previously outlined herein.

## IX.

## DAMAGES

All of the allegations heretofore set out are incorporated herein for all purposes.

As a proximate cause or, in the alternative, a producing cause of the acts, omissions, fraud, misrepresentation, breach of contract, breach of warranties, negligence, and violations of the Deceptive Trade Practices Act, Plaintiffs have suffered the following items of damages:

a)   lost profits, past and future;

b)   damages caused by increased warranty and overhead costs;

c)   damages for cover, i.e., finding a suitable replacement which includes increased overhead and additional testing;

d)   attorneys fees.

In addition to those items specifically enumerated above, Plaintiffs would show that they are entitled to recover prejudgment and post judgment interest, additional damages as authorized by the Deceptive Trade Practices Act, and punitive damages.

## X.

Plaintiffs' demand a jury trial. All applicable fees have previously been paid.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray that upon final hearing hereof they have and recover of and from the Defendants, jointly and severally, such actual, special and consequential damages as the jury finds just and reasonable, together with interest, attorneys fees, prejudgment and post judgment, attorneys fees, court costs, punitive damages, and additional damages authorized by the DTPA, and for such other and further relief, both general and special, at law and in equity, to which Plaintiffs may show themselves justly entitled.

Respectfully submitted,

STEVE A. BRYANT & ASSOCIATES, P.C.

Steve A. Bryant
Texas Bar No. 03277900
3618 Mt. Vernon, Suite A
Houston, Texas 77006
Telephone 713-526-7474
Facsimile 713-526-7720

Citation for Personal Service – NON-RESIDENT NOTICE    Lit. Seq. # 5.006.01

06541

No. 2002-03-000933-E

2002 MAR 15 AM 11:03

T H E   S T A T E   O F   T E X A S      *ORIGINAL*

NOTICE TO DEFENDANT:  You have been sued.  You may employ an attorney.  If you or your attorney do not file a written answer with the clerk who issued this citation by 10:00 a.m. on the Monday next following the expiration of twenty days after you were served this citation and petition, a default judgment may be taken against you.

TO: EMERSON ELECTRIC CO.
    SERVING ITS REGISTERED AGENT:
    ~~CT CORPORATION SYSTEM~~
    350 N. ST. PAUL
    DALLAS, TX 75201

| DEP. NO. | DATE |
|----------|------|
| 413 | 3-15-02 |

the _____ DEFENDANT _____ , GREETING:

You are commanded to appear by filing a written answer to the

PLAINTIFF'S ORIGINAL PETITION

at or before 10:00 o'clock a.m. of the Monday next after the expiration of 20 days after the date of service of this citation before the Honorable District Court 357th Judicial District of Cameron County, Texas at the Courthouse of said county in Brownsville, Texas.  Said _____ PETITION _____ was filed on MARCH 05, 2002 .  A copy of same accompanies this citation.

The file number of said suit being No. 2002-03-000933-E.

The style of the case is:

*DALLAS COUNTY SHERIFF FEE COLLECTED*

MICROTHERM, INC, MAVID MAQUILADOR, S.A., ET AL
VS.
TRIQUEST-PUGET PLASTICS, L.L.C., ET AL.

Said petition was filed in said court by _____ STEVE A. BRYANT _____
(Attorney for _____ PLAINTIFF _____ ), whose address is
3618 MT. VERNON, SUITE A. HOUSTON, TEXAS  77006

The nature of the demand is fully shown by a true and correct copy of the Petition accompanying this citation and made a part hereof.

The officer executing this writ shall promptly serve the same according to requirements of law, and the mandates thereof, and make due return as the law directs.

Issued and given under my hand and seal of said Court at Brownsville, Texas, this the 5th day of _____ MARCH _____ , A.D. 2002 .

AURORA DE LA GARZA , DISTRICT CLERK
Cameron County, Texas
974 E. Harrison St.
Brownsville, Texas 78521

By: _____ , Deputy

R E T U R N   O F   O F F I C E R

Came to hand the _15_ day of _MARCH_, _2002_, at _9_ o'clock_A_.M., and

executed (not executed) on the _14_ day of _MARCH_, _2002_, by delivering to

_C.T CORP SYS R/A_____ in person a true copy of this Citation,

upon which I endorsed the date of delivery, together with the accompanying copy

of the _PETITION_____.

Cause of failure to execute this citation is: _____

FEES serving 1 copy

Total....... $ _55_._        Sheriff/constable _____ County_____

Fees paid by:_____        By _____ Deputy

J.J. Pena #150
Deputy Sheriff

Dallas County Sheriff's Dept.        FILED _____ M
Writ Enforcement Section 3132        AURORA DE LA GARZA, DIST. CLERK
133 N. Industrial Blvd. LB-31
Dallas, TX 75207

APR 05 2002

DISTRICT COURT CAMERON COUNTY TEXAS
BY_____ DEPUTY
Rosie Sotelo

Citation for Personal Service - NON-RESIDENT NOTICE    Lit. Seq. # 5.010.01
                                                         0 6 5 3 9

No. 2002-03-000933-E   2002 MAR 15  :III:08 *ORIGINAL*

T H E    S T A T E    O F    T E X A S

NOTICE TO DEFENDANT: You have been sued. You may employ an attorney. If you or your attorney do not file a written answer with the clerk who issued this citation by 10:00 a.m. on the Monday next following the expiration of twenty days after you were served this citation and petition, a default judgment may be taken against you.

TO: DANA CORPORATION
    SERVING ITS REGISTERED AGENT:
    ~~CT CORP SYSTEM,~~
    350 N. ST. PAUL
    DALLAS, TX 75201

| DEF. NO. | DATE |
|----------|------|
| 413      | 3-15-02 |

the _____ DEFENDANT _____ , GREETING:

You are commanded to appear by filing a written answer to the

PLAINTIFF'S ORIGINAL PETITION

at or before 10:00 o'clock a.m. of the Monday next after the expiration of 20 days after the date of service of this citation before the Honorable District Court 357th Judicial District of Cameron County, Texas at the Courthouse of said county in Brownsville, Texas. Said _____ PETITION _____ was filed on MARCH 05, 2002 . A copy of same accompanies this citation.

The file number of said suit being No. 2002-03-000933-E .

The style of the case is:

*DALLAS COUNTY*
*SHERIFF FEE*
*COLLECTED*

MICROTHERM, INC, MAVID MAQUILADOR, S.A., ET AL.
VS.
TRIQUEST-PUGET PLASTICS, L.L.C., ET AL.

Said petition was filed in said court by _____ STEVE A. BRYANT
(Attorney for _____ PLAINTIFF _____ ), whose address is
3618 MT. VERNON, SUITE A. HOUSTON, TEXAS  77006 .

The nature of the demand is fully shown by a true and correct copy of the Petition accompanying this citation and made a part hereof.

The officer executing this writ shall promptly serve the same according to requirements of law, and the mandates thereof, and make due return as the law directs.

Issued and given under my hand and seal of said Court at Brownsville, Texas, this the 5th day of __ MARCH __ , A.D. 2002.

                    AURORA DE LA GARZA     , DISTRICT CLERK
Cameron County, Texas
974 E. Harrison St.
Brownsville, Texas 78521
By: _____ Jody Mendez _____ , Deputy

RETURN OF OFFICER

Came to hand the _15_ day of _MARCH_, _2002_, at _9_ o'clock_ _.M., and executed (not executed) on the _19_ day of _MARCH_, _2002_, by delivering to _C T CORP SYS R/A_ in person a true copy of this Citation, upon which I endorsed the date of delivery, together with the accompanying copy of the _PETITION_ .

Cause of failure to execute this citation is: _____

_____

FEES serving 1 copy

Total....... $ _55_

Fees paid by: _____

Sheriff/constable _____ County,

By _____ J.J. Pena #150 _____ Deputy
Deputy Sheriff

FILED _6:03_ O'CLOCK _A_ M
AURORA DE LA GARZA DIST CLERK

APR 05 2002

DISTRICT COURT CAMERON COUNTY TEXAS
_____ DEPUTY
Rosie Sotelo

**Dallas County Sheriff's Dept.**
**Writ Enforcement Section 3132**
**133 N. Industrial Blvd. LB-31**
**Dallas, TX 75207**

## CAUSE NO. 03-933-E

| | | |
|---|---|---|
| MICROTHERM, INC.; MAVID | * | IN THE DISTRICT COURT |
| MAQUILADORA,M and DAVID E. | * | |
| SEITZ, Individually | * | |
| | * | |
| VS. | * | CAMERON COUNTY, TEXAS |
| | * | |
| TRIQUEST-PUGET PLASTICS, L.L.C., | * | |
| A Subsidiary of ARCTIC SLOPE | * | |
| REGIONAL CORPORATION; ARCTIC | * | |
| SLOPE REGIONAL CORPORATION; | * | |
| EMERSON ELECTRIC CO.; | * | |
| WIEGAND APPLIANCE DIVISION | * | |
| OF EMERSON ELECTRIC CO.; | * | |
| CHROMOLOX, INC.; DANA | * | |
| CORPORATION; and DANA ENGINE | * | |
| CONTROLS | * | 357th JUDICIAL DISTRICT |

FILED ___ O'CLOCK ___ M
AURORA DE LA GARZA DIST. CLERK
APR 0 5 2002
DISTRICT COURT OF CAMERON COUNTY, TEXAS
DEPUTY

### DEFENDANTS' MOTION TO TRANSFER VENUE, AND SUBJECT THERETO, ORIGINAL ANSWER AND JURY DEMAND

TO THE HONORABLE JUDGE OF SAID COURT:

COME NOW EMERSON ELECTRIC CO. and WIEGAND APPLIANCE DIVISION OF EMERSON ELECTRIC CO., Defendants in the above entitled and numbered cause, and, prior to filing their Original Answer and Jury Demand in this cause, file this their Motion to Transfer Venue, pursuant to Section 15.002 of the Texas Civil Practices & Remedies Code and Rule 86 of the Texas Rules of Civil Procedure, and in support thereof would show the Court as follows:

### MOTION TO TRANSFER VENUE

#### I.

Defendants object to venue in Cameron County, Texas, on the ground that said county is not a county where venue of this action is proper, and no basis exists mandating or permitting venue of the action in said county. Cameron County is not a county of proper venue because Defendants do not have a principal office in Cameron County, the cause of action did not accrue in Cameron County, and no mandatory or

permissive exception authorizes the maintenance of the action against Defendants in Cameron County.

II.

Defendants would further show the Court that Defendant Emerson Electric Co. is a foreign corporation, with its principal office in Missouri, and Defendant Wiegand Appliance Division of Emerson Electric Co. is a division of Emerson Electric Co. rather than a separate legal entity. The venue provision of Tex. Civ. Prac. & Rem. Code §15.002 states that all lawsuits shall be brought:

(1)    In the county in which all or a substantial part of the events or omissions giving rise to the claim occurred; or

(2)    In the county of defendant's residence at the time the cause of action accrued if defendant is a natural person; or

(3)    In the county of the defendant's principal office in this state, if the defendant is not a natural person; or

(4)    If (1), (2), and (3) do not apply, in the county in which the plaintiff resided at the time of the accrual of the cause of action.

III.

Defendants specifically deny that "venue is proper in Cameron County, Texas, pursuant to Texas Civil Practice & Remedies Code §15.002a(1) and (3)" as alleged in Plaintiffs' Original Petition. Defendants would show that, if a cause of action against them exists, which is denied, the cause of action does not exist in Cameron County. Defendants further deny that they had a principal office in Cameron County as that term is defined by Tex. Civ. Prac. & Rem. Code §15.001, at the time this action was instituted or at any time relevant to this cause of action. Defendants specifically deny that any other Defendant had a principal office in Cameron County, Texas at the time this action was instituted or at any time relevant to this cause of action. Defendants also specifically deny that the events giving rise to the claims alleged in Plaintiffs' Original Petition occurred in Cameron County, Texas.

IV.

Defendants further aver that venue is proper in Harris County, Texas, in that it is the county where Plaintiff Microtherm has its residence.

V.

Defendants request that this action be transferred to a district court of Harris County, Texas.

WHEREFORE, Defendant requests that this Court grant Defendants' motion to transfer venue and transfer such cause to Harris County, taxing costs incurred herein against Plaintiffs; and that Defendants have such other and further relief to which they may show themselves justly entitled to receive.

## ORIGINAL ANSWER SUBJECT TO MOTION TO TRANSFER VENUE

COME NOW EMERSON ELECTRIC CO. and WIEGAND APPLIANCE DIVISION OF EMERSON ELECTRIC CO., Defendants in the above entitled and numbered cause, and, subject to and without waiving their Motion to Transfer Venue, file this their Original Answer and Jury Demand in response to Plaintiffs' Original Petition, and in support thereof, would show the Court as follows:

VI.

## GENERAL DENIAL

Defendants herein avail themselves of the opportunity provided by Rule 92 of the Texas Rules of Civil Procedure to file a general denial herein; and in compliance with said Rule, Defendants deny each and every, all and singular, the material allegations contained in Plaintiffs' currently pending Petition, and state that these are matters that should be proven by Plaintiffs as required by law; and Defendants would require strict proof thereof.

## VII.

## AFFIRMATIVE DEFENSES

7.01   For further answer, if such be necessary, and pleading in the alternative, Defendants further affirmatively allege that Plaintiffs' claims are barred, in whole or in part, due to the contributory negligence of Plaintiffs in that they failed to exercise ordinary care, caution and prudence to avoid the incident and damages at issue. Plaintiffs' acts and omissions, whether taken together or separately, proximately caused the injuries and damages to Plaintiffs which are alleged in Plaintiffs' petition.

7.02   For further answer, if such be necessary, and pleading in the alternative, Defendants further affirmatively allege that if Plaintiffs were damaged as alleged, which is not admitted but is expressly denied, such damages were caused or contributed to, in whole or in part, by a party for whom Defendants are not responsible.

7.03   For further answer, if such be necessary, and pleading in the alternative, Defendants further affirmatively allege that Plaintiffs' claims are barred, in whole or in part, because Plaintiffs failed to mitigate the effect of their alleged damages as required by law.

7.04   For further answer, if such be necessary, and pleading in the alternative, Defendants further affirmatively allege that the damages in this case, if any, were proximately caused by the negligence of third parties and any recovery should be barred or diminished under the applicable provisions of the law.

7.05   For further answer, if such be necessary, and pleading in the alternative, Defendants further invoke the provisions of §33.001 of the Texas Civil Practice & Remedies Code. In this case, Defendants allege that the negligence of Plaintiffs is fifty-one percent (51%) or greater, and therefore, no damages may be recovered from Defendants.

7.06   For further answer, if such be necessary, and pleading in the alternative, Defendants further invoke the provisions of §33.013 of the Texas Civil Practices &

Remedies Code in the unlikely event that liability is established by the Plaintiffs in this cause.

7.07   For further answer, if such be necessary, and pleading in the alternative, Defendants further specifically deny that they are liable for prejudgment interest in this cause of action as pled by Plaintiffs.

7.08   For further answer, if such be necessary, and pleading in the alternative, Defendant further specifically pleads the limitation of recovery of exemplary damages as set forth in Section 41.008, et seq. of the Texas Civil Practice & Remedies Code.

7.09   For further answer, if such be necessary, and pleading in the alternative, Defendants further affirmatively deny that they are liable for exemplary damages and plead affirmatively the provisions of Chapter 41, of the Texas Civil Practices & Remedies Code, including the provisions on applicability, standards for recovery, preclusions, prejudgment interest, and limitations on amount.

7.10   For further answer, if such be necessary, and pleading in the alternative, Defendants further affirmatively state that an award of punitive damages in this case would violate the procedural due process guaranteed by the Constitution of the United States. Texas Law, and the instructions given to the jury, are vague and standardless as to whether and how much to punish a defendant, and are likely to produce arbitrary and capricious results. Therefore, any award of punitive damages should be disallowed, or declared null and void.

7.11   For further answer, if such be necessary, and pleading in the alternative, Defendants further affirmatively allege that Plaintiffs are not entitled to exemplary or punitive damages as alleged, for the reason that exemplary damages are unconstitutional and violative of the provisions of the United States Constitution and the Texas Constitution, including but not limited to the following provisions:

(a)   Proscription on excessive fines. U. S. Constitution Amendment 8; Texas Constitution Article I, Section 13.

(b)   Requirements of Due Process. U. S. Constitution Amendments 5 and 14; Texas Constitution Article I, Sections 13 and 19.

(c)   Requirement of Equal Protection Under the Law. U. S. Constitution Amendments 5 and 14; Texas Constitution Article I, Sections 3 and 3a.

(d)   Proscription on Ex Post Facto and Retroactive Law. U. S. Constitution Article I, Section 10; Texas Constitution Article I, Section 16.

(e)   Such punitive damages are penal in nature. Under Texas law, they are not tied to any fair, just, and reasonable relation to actual damages. Consequently, exemplary damages violate the contract clause of the U. S. Constitution, U. S. Constitution Article I, Section 10.

7.12   For further answer, if such be necessary, and pleading in the alternative, Defendants further affirmatively allege that Plaintiffs' claims are barred by the economic loss rule.

7.13   For further answer, if such be necessary, and pleading in the alternative, Defendants further affirmatively allege that Plaintiffs' claims are barred due to their failure to provide timely notice of the alleged breach as required by Tex. Bus. & Com. Code § 2.607(c).

7.14   For further answer, if such be necessary, and pleading in the alternative, Defendants further affirmatively allege that Plaintiffs' claims for damages exceed those allowed or of a type not allowed under the liquidated damages and/or limitation of liability clauses in the contract between the parties.

7.15   For further answer, if such be necessary, and pleading in the alternative, Defendants further affirmatively allege that Plaintiffs' claims for consequential damages are barred by the parties' contract.

7.16   For further answer, if such be necessary, and pleading in the alternative, Defendants further affirmatively allege that Defendant Wiegand Appliance Division of Emerson Electric Co. is not a proper party in that it is not a separate legal entity capable of suing or being sued.

7.17   For further answer, if such be necessary, and pleading in the alternative, Defendants further affirmatively allege that Plaintiffs' Texas Deceptive Trade Practices Act claim is barred by the two-year statute of limitations expressed in Tex. Bus. & Comm. Code § 17.565.

7.18   For further answer, if such be necessary, and pleading in the alternative, Defendants further affirmatively allege that Plaintiffs' Breach of Contract claim is barred by the one-year contractual statute of limitations in the parties' contract.  Tex. Bus. & Comm. Code § 2.725.

7.19   For further answer, if such be necessary, and pleading in the alternative, Defendants further affirmatively allege that Plaintiffs' misrepresentation claims are barred by the two-year statute of limitations expressed in Tex. Civ. Prac. & Rem. Code § 16.003.

7.20   For further answer, if such be necessary, and pleading in the alternative, Defendants further affirmatively allege that Plaintiffs' negligence claims are barred by the two-year statute of limitations expressed in Tex. Civ. Prac. & Rem. Code § 16.003.

7.21   For further answer, if such be necessary, and pleading in the alternative, Defendants further affirmatively allege that All of Plaintiffs' claims are barred by the one-year statute of limitations in the parties' contract.

7.22   For further answer, if such be necessary, and pleading in the alternative, Defendants further affirmatively allege that Plaintiffs' claims are barred by the doctrine of unclean hands.

7.23   For further answer, if such be necessary, and pleading in the alternative, Defendants further affirmatively allege that Plaintiffs lack standing to bring their claims.

7.24   For further answer, if such be necessary, and pleading in the alternative, Defendants further affirmatively allege that Plaintiffs' claims are barred by the doctrine of ratification.

7.25   For further answer, if such be necessary, and pleading in the alternative, Defendants further affirmatively allege that Plaintiffs' claims are barred by the doctrine of accord and satisfaction.

7.26   For further answer, if such be necessary, and pleading in the alternative, Defendants further affirmatively allege that Plaintiffs' claims are barred by the doctrine of payment.

7.27   For further answer, if such be necessary, and pleading in the alternative, Defendants further affirmatively allege that Plaintiffs' claims are barred by the doctrine of release.

7.28   For further answer, if such be necessary, and pleading in the alternative, Defendants further affirmatively allege that Defendant Chromolox, Inc., is not a proper party to this suit because it had no dealings or contract with any of the Plaintiffs.

VIII.

JURY DEMAND SUBJECT TO MOTION TO TRANSFER VENUE

Subject to and without waiving its Motion to Transfer Venue, Defendants hereby request a trial by jury and tender the jury fee herewith.

WHEREFORE, Defendants Emerson Electric Co. and Wiegand Appliance Division of Emerson Electric Co. pray that upon final trial and hearing hereof, it have judgment in accordance with the law and facts as found by this Honorable Court and Jury, and for such other and further relief, legal or equitable, general or special, to which they may show themselves justly entitled to receive.

Respectfully submitted,

RODRIGUEZ, COLVIN & CHANEY, L.L.P.

By: _Eduardo Roberto Rodriguez_
       Eduardo Roberto Rodriguez
       Attorney-in-Charge
       State Bar No. 17144000

R. Patrick Rodriguez 24002861
State Bar No. 17146600
1201 East Van Buren
Post Office Box 2155
Brownsville, Texas 78522
(956) 542-7441
Fax (956) 541-2170

Timothy G. O'Neill
Colorado Bar No. 17311
Brent D. Anderson
Texas Bar No. 00786977
SNELL & WILMER, L.L.P.
Tabor Center, Suite 1900
1200 Seventeenth Street
Denver, Colorado 80202

ATTORNEYS FOR DEFENDANTS,
EMERSON ELECTRIC CO. and WIEGAND
APPLIANCE DIVISION OF EMERSON
ELECTRIC CO.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of Defendants' Motion to Transfer Venue, and Subject Thereto, Original Answer and Jury Demand was served upon all counsel of record, to-wit:

> Steve A. Bryant
> Steve A. Bryant & Associates, P.C.
> 3618 Mt. Vernon, Suite A
> Houston, Texas 77006
> Attorneys for Plaintiffs
>
> William Wood
> Fulbright & Jaworski
> 1301 McKinney
> Suite 5100
> Houston, Texas 77010
> Attorneys for Defendants
> Arctic Slope Regional Corporation and Triquest-Puget Plastics, LLC
>
> Peter Blute
> 11601 Katy Freeway
> Suite 101
> Houston, Texas 77079
> Attorneys for Defendants Dana Corporation and Dana Engine
> Controls

by certified mail, return receipt requested, facsimile transmission, and/or hand delivery pursuant to the Texas Rules of Civil Procedure on this the 5th day of April, 2002.

_____
Eduardo Roberto Rodriguez

26188.1

FILED 8:45 O'CLOCK A M
AURORA DE LA GARZA DIST. CLERK

APR 0 8 2002

DISTRICT COURT OF CAMERON COUNTY, TEXAS
DEPUTY

NO. 2002-03-933-E

| | | |
|---|---|---|
| MICROTHERM, INC., ET AL. COMPANY | § § § | IN THE DISTRICT COURT OF |
| VS. | § § | CAMERON COUNTY, TEXAS |
| TRIQUEST-PUGET PLASTICS, L.L.C., ET AL. | § § | 357TH JUDICIAL DISTRICT |

## SPECIAL APPEARANCE, AND SUBJECT THERETO, MOTION TO TRANSFER VENUE OF TRIQUEST PUGET PLASTICS, LLC, AND ARCTIC SLOPE REGIONAL CORPORATION

1.      Triquest Puget Plastics, LLC ("Triquest"), and Arctic Slope Regional Corporation ("ASRC") (collectively "defendants") file this special appearance under Rule 120a of the Texas Rules of Civil Procedure to this entire proceeding before any other plea, pleading or motion.

2.      This Court lacks personal jurisdiction over the defendants for the following reasons:

   a.      Triquest is incorporated, not under the laws of Texas, but under the laws of another state, and its principal place of business is in Vancouver, Washington.

   b.      ASRC is incorporated, not under the laws of Texas, but under the laws of another state, and its principal place of business is in Barrow, Alaska.

   c.      Neither Triquest nor ASRC maintain a place of business in Texas and do not have agents or employees within Texas.

   d.      Neither Triquest nor ASRC have sufficient "minimum contacts" with Texas to justify imposing jurisdiction over the defendants, and the exercise of jurisdiction over the defendants would violate the fourteenth amendment to the United States Constitution.

   e.      Neither Triquest nor ASRC do business in Texas within the meaning of

#30228733v1<

Section 17.042 of the Texas Civil Practice and Remedies Code.

For the reasons above, the defendants pray for a dismissal of this case on account of a lack of personal jurisdiction, for all costs, and for all other just relief.

## MOTION TO TRANSFER VENUE
## SUBJECT TO SPECIAL APPEARANCE

1.     Defendants move to transfer venue of this case to Harris County, Texas pursuant to Rules 86 and 87 of the Texas Rules of Civil Procedure, and pursuant to Section 15.063 of the Texas Civil Practice and Remedies Code, because (a) venue is not proper in Cameron County and (b) venue is proper in Harris County, Texas.

2.     Defendants specifically deny all of the purported venue facts and venue theories alleged by plaintiffs pursuant to Texas Civil Practice and Remedies Code § 15.002a(1) and (3).  Cameron County is not a county of proper venue because defendants do not have a principal office in Cameron County, the cause of action did not accrue in Cameron County, and no mandatory or permissive exception authorizes the maintenance of the action against the defendants in Cameron County.

3.     Venue is proper in Harris County because plaintiff Microtherm, Inc. maintains its principal office in Harris County, Texas.  TEX. CIV. PRAC. & REM. CODE ANN. § 15.002.

4.     Defendants request that this action be transferred to a district court in Harris County, Texas.

Defendants request that this Court grant their motion to transfer venue and transfer such cause to Harris County, taxing costs incurred herein against plaintiffs; and that defendants have such other and further relief to which they may show themselves justly entitled to receive.

#30228733v1<

FULBRIGHT & JAWORSKI L.L.P.


By: _William Wood_____
     William D. Wood. *w/ permission* McBratotell
     State Bar No. 21916500
     Graig J. Alvarez
     State Bar No. 24001647
1301 McKinney, Suite 5100
Houston, Texas  77010-3095
Telephone:  713/651-5151
Telecopier:  713/651-5246

**COUNSEL FOR DEFENDANTS,
TRIQUEST PUGET PLASTICS, LLC, AND
ARCTIC SLOPE REGIONAL CORPORATION**


## CERTIFICATE OF SERVICE

    This pleading was served in compliance with Rules 21 and 21a of the Texas Rules of Civil Procedure on April 8, 2002.


_Graig Alvarez_____
    Graig J. Alvarez *w/ permission* McBratotell


#30228733v1<

# CAUSE NO. 03-933-E

| | | |
|---|---|---|
| MICROTHERM, INC.; MAVID | * | IN THE DISTRICT COURT |
| MAQUILADORA, and DAVID E. | * | |
| SEITZ, Individually | * | |
| | * | |
| VS. | * | CAMERON COUNTY, TEXAS |
| | * | |
| TRIQUEST-PUGET PLASTICS, L.L.C., | * | |
| A Subsidiary of ARCTIC SLOPE | * | |
| REGIONAL CORPORATION; ARCTIC | * | |
| SLOPE REGIONAL CORPORATION; | * | |
| EMERSON ELECTRIC CO.; | * | |
| WIEGAND APPLIANCE DIVISION | * | |
| OF EMERSON ELECTRIC CO.; | * | |
| CHROMALOX, INC.; DANA | * | |
| CORPORATION; and DANA ENGINE | * | |
| CONTROLS | * | 357th JUDICIAL DISTRICT |

## NOTICE TO THE DISTRICT CLERK OF FILING
## OF NOTICE OF REMOVAL

TO:    HONORABLE AURORA DE LA GARZA
       Cameron County District Clerk
       Cameron County Courthouse
       974 East Harrison
       Brownsville, Texas 78520

You will please take notice that Defendants Emerson Electric Co. and Wiegand

Appliance Division of Emerson Electric Co. have filed in the United States District Court

for the Southern District of Texas, Brownsville Division, a notice of removal of the cause

styled: Microtherm, Inc., Mavid Maquiladora, S.A. and David E. Seitz v. Triquest-Puget

Plastics, L.L.C., a Subsidiary of Arctic Slope Regional Corporation, Arctic Slope

Regional Corporation, Emerson Electric Co., Wiegand Appliance Division of Emerson

Electric Co., Chromalox, Inc., Dana Corporation, and Dana Engine Controls, originally

filed in the 357th Judicial District Court of Cameron County, Texas, Cause 03-933-E, to

the United States District Court for the Southern District of Texas, Brownsville Division,

and that a true and correct copy of said Notice of Removal is being filed with the Clerk

of the 357th Judicial District Court to thereby effect a removal to said District Court of

the United States, and that the State Court shall proceed no further, unless the cause is remanded. A copy of said notice of removal is attached to this notice.

WITNESS the signature of Defendants, through their attorney, on this the 8th day of April, 2002.

Respectfully submitted,

RODRIGUEZ, COLVIN & CHANEY, L.L.P.

By: _____ Eduardo Roberto Rodriguez
Eduardo Roberto Rodriguez *m permission*
Attorney-in-Charge                 *MCfarlou*
State Bar No. 17144000
Federal Admissions No. 1944
        R. Patrick 24002861
State Bar No. 17146600
Federal Admissions No. 22949
1201 East Van Buren
Post Office Box 2155
Brownsville, Texas 78522
(956) 542-7441
Fax (956) 541-2170

        Timothy G. O'Neill
Colorado Bar No. 17311
Federal Admissions No. 18694
        Brent D. Anderson
Texas Bar No. 00786977
Federal Admissions No. 17874
SNELL & WILMER, L.L.P.
Tabor Center, Suite 1900
1200 Seventeenth Street
Denver, Colorado 80202
(303) 634-2000
Fax (303) 634-2020

ATTORNEYS FOR DEFENDANTS,
EMERSON ELECTRIC CO. and WIEGAND
APPLIANCE DIVISION OF EMERSON
ELECTRIC CO.

CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of Notice to District Clerk of Filing of Notice of Removal was served upon all counsel of record, to-wit:

Steve A. Bryant
Steve A. Bryant & Associates, P.C.
3618 Mt. Vernon, Suite A
Houston, Texas 77006
Attorneys for Plaintiffs

William D. Wood
Graig J. Alvarez
Fulbright & Jaworski, LLP
1301 McKinney, Suite 5100
Houston, Texas 77010
Attorneys for Defendants, Arctic Slope Regional Corporation and Triquest-Puget Plastics, LLC

Peter Blute
11601 Katy Freeway, Suite 101
Houston, Texas 77079
Attorneys for Defendants, Dana Corporation and Dana Engine Controls

Wendy Smith
Kirkpatrick & Lockhart, LLP
Henry W. Oliver Building
535 Smithfield Street
Pittsburgh, Pennsylvania 15222
Attorneys for Defendant Chromalox, Inc.

by certified mail, return receipt requested, hand delivery, and/or facsimile transmission pursuant to the Texas Rules of Civil Procedure, on this the 8th day of April, 2002.

_____
Eduardo Roberto Rodriguez

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

MICROTHERM, INC.; MAVID                  *
MAQUILADORA, and DAVID E.                *
SEITZ, Individually                      *
                                         *
VS.                                      *      CIVIL ACTION NO. B-02- U6Y
                                         *
TRIQUEST-PUGET PLASTICS, L.L.C.,         *
A Subsidiary of ARCTIC SLOPE             *
REGIONAL CORPORATION; ARCTIC             *
SLOPE REGIONAL CORPORATION;              *
EMERSON ELECTRIC CO.;                    *
WIEGAND APPLIANCE DIVISION               *
OF EMERSON ELECTRIC CO.;                 *
CHROMALOX, INC.; DANA                    *
CORPORATION; and DANA ENGINE             *
CONTROLS                                 *

## NOTICE TO THE PLAINTIFFS OF FILING
## OF NOTICE OF REMOVAL

TO:   MICROTHERM, INC., MAVID MAQUILADORA, S.A., and DAVID E. SEITZ,
      Plaintiffs, and their attorneys:

      Steve A. Bryant
      Steve A. Bryant & Associates, P.C.
      3618 Mt. Vernon, Suite A
      Houston, Texas 77006

      PURSUANT to Title 28 U.S.C., Section 1446(d), as amended, you are hereby

notified that on the 8th day of April, 2002, in the above styled and numbered cause

(being Cause Number 03-933-E in the 357th Judicial District Court of Cameron County,

Texas), EMERSON ELECTRIC CO. and WIEGAND APPLIANCE DIVISION OF

EMERSON ELECTRIC CO. filed their Notice of Removal in the United States District

Court for the Southern District of Texas, Brownsville Division.  Copies of such Notice

and other papers so filed are attached hereto.

Respectfully submitted,

RODRIGUEZ, COLVIN & CHANEY, L.L.P.

By: _Eduardo Roberto Rodriguez_ —
    Eduardo Roberto Rodriguez w/ _permission_
    Attorney-in-Charge
    State Bar No. 17144000
    Federal Admissions No. 1944
       R. Patrick 24002861
    State Bar No. 17146600
    Federal Admissions No. 22949
    1201 East Van Buren
    Post Office Box 2155
    Brownsville, Texas 78522
    (956) 542-7441
    Fax (956) 541-2170

       Timothy G. O'Neill
    Colorado Bar No. 17311
    Federal Admissions No. 18694
       Brent D. Anderson
    Texas Bar No. 00786977
    Federal Admissions No. 17874
    SNELL & WILMER, L.L.P.
    Tabor Center, Suite 1900
    1200 Seventeenth Street
    Denver, Colorado 80202
    (303) 634-2000
    Fax (303) 634-2020

    ATTORNEYS FOR DEFENDANTS,
    EMERSON ELECTRIC CO. and WIEGAND
    APPLIANCE DIVISION OF EMERSON
    ELECTRIC CO.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of Notice to Plaintiffs of Filing of Notice of Removal was served upon all counsel of record, to-wit:

>       Steve A. Bryant
>       Steve A. Bryant & Associates, P.C.
>       3618 Mt. Vernon, Suite A
>       Houston, Texas 77006
>       Attorneys for Plaintiffs
>
>       William D. Wood
>       Graig J. Alvarez
>       Fulbright & Jaworski, LLP
>       1301 McKinney, Suite 5100
>       Houston, Texas 77010
>       Attorneys for Defendants, Arctic Slope Regional Corporation and
>                Triquest-Puget Plastics, LLC
>
>       Peter Blute
>       11601 Katy Freeway, Suite 101
>       Houston, Texas 77079
>       Attorneys for Defendants, Dana Corporation and Dana Engine
>                Controls
>
>       Wendy Smith
>       Kirkpatrick & Lockhart, LLP
>       Henry W. Oliver Building
>       535 Smithfield Street
>       Pittsburgh, Pennsylvania 15222
>       Attorneys for Defendant Chromalox, Inc.

by certified mail, return receipt requested, hand delivery, and/or facsimile transmission pursuant to the Federal Rules of Civil Procedure, on this the 8th day of April, 2002.

_____
Eduardo Roberto Rodriguez

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

MICROTHERM, INC.; MAVID          *
MAQUILADORA, and DAVID E.        *
SEITZ, Individually              *
                                 *          CIVIL ACTION NO. **B-02- 069**
VS.                              *
                                 *
TRIQUEST-PUGET PLASTICS, L.L.C., *
A Subsidiary of ARCTIC SLOPE     *
REGIONAL CORPORATION; ARCTIC     *
SLOPE REGIONAL CORPORATION;      *
EMERSON ELECTRIC CO.;            *
WIEGAND APPLIANCE DIVISION       *
OF EMERSON ELECTRIC CO.;         *
CHROMALOX, INC.; DANA            *
CORPORATION; and DANA ENGINE     *
CONTROLS                         *

## INDEX OF ATTORNEYS

1.   Steve A. Bryant
     State Bar No. 03277900
     Federal Admissions No. Unknown
     Steve A. Bryant & Associates, P.C.
     3618 Mt. Vernon, Suite A
     Houston, Texas 77006
     (713) 526-7474
     Fax (713) 526-7720
     Attorneys for Plaintiffs

2.   Eduardo Roberto Rodriguez
     State Bar No. 17144000
     Federal Admissions No. 1944
     R. Patrick Rodriguez
     State Bar No. 24002861
     Federal Admissions No. 22949
     Rodriguez, Colvin & Chaney, L.L.P.
     Post Office Box 2155
     Brownsville, Texas 78522
     (956) 542-7441
     Fax (956) 541-2170
     Attorneys for Defendants Emerson Electric Co. and Wiegand Appliance Division
     of Emerson Electric Co.

3.  Timothy G. O'Neill
    Colorado Bar No. 17311
    Federal Admissions No. 18694
    Brent D. Anderson
    Texas Bar No. 00786977
    Federal Admissions No. 17874
    Snell & Wilmer, L.L.P.
    Tabor Center
    1200 Seventeenth Street, Suite 1950
    Denver, Colorado 80202
    (303) 634-2000
    Fax (303) 634-2020
    Attorneys for Defendants Emerson Electric Co. and Wiegand Appliance Division
    of Emerson Electric Co.

4.  Wendy Smith
    Kirkpatrick & Lockhart, LLP
    Henry W. Oliver Building
    535 Smithfield Street
    Pittsburgh, Pennsylvania 15222
    (412) 355-6500
    Attorneys for Defendant Chromalox, Inc.

5.  William D. Wood
    State Bar No. 21916500
    Federal Admissions No. 2002
    Graig J. Alvarez
    State Bar No. 24001647
    Federal Admissions No. 22596
    Fulbright & Jaworski, L.L.P.
    1301 McKinney Street, Suite 5100
    Houston, Texas 77010-3095
    (713) 651-5151
    Fax (713) 651-5246
    Attorneys for Defendants Triquest Puget Plastics, LLC and Arctic Slope Regional
    Corporation

6.  Peter M. Blute
    State Bar No. 02521600
    Federal Admissions No. Unknown
    11601 Katy Freeway, Suite 101
    Houston, Texas 77079
    (281) 496-0555
    Fax (281) 496-0505
    Attorneys for Defendants Dana Corporation and Dana Engine Controls

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

MICROTHERM, INC.; MAVID          *
MAQUILADORA, and DAVID E.        *
SEITZ, Individually              *
                                 *                    B-02- 069
VS.                              *      CIVIL ACTION NO. _____
                                 *
TRIQUEST-PUGET PLASTICS, L.L.C., *
A Subsidiary of ARCTIC SLOPE     *
REGIONAL CORPORATION; ARCTIC     *
SLOPE REGIONAL CORPORATION;      *
EMERSON ELECTRIC CO.;            *
WIEGAND APPLIANCE DIVISION       *
OF EMERSON ELECTRIC CO.;         *
CHROMALOX, INC.; DANA            *
CORPORATION; and DANA ENGINE     *
CONTROLS                         *

## INDEX OF DOCUMENTS FILED

1.  Civil Cover Sheet

2.  Notice of Removal with following attachments:

    a.  State Court's Docket Sheet
    b.  Plaintiffs' Original Petition
    c.  Citation served on Emerson Electric Co.
    d.  Citation served on Dana Corporation
    e.  Defendants Emerson Electric Co. and Weigand Appliance Division of
        Emerson Electric Co.'s Motion to Transfer Venue, and Subject Thereto,
        Original Answer and Jury Demand
    f.  Special Appearance , and Subject Thereto, Motion to Transfer Venue of
        Triquest Puget Plastics, LLC, and Arctic Slope Regional Corporation

3.  Notice to Plaintiffs of Filing of Notice of Removal

4.  Notice to District Clerk of Filing of Notice of Removal

5.  Index of Attorneys

6.  Index of Documents Filed

7.  Consent to Removal of Defendant Chromalox, Inc.

8.  Consent to Removal of Defendants Triquest Puget Plastics, LLC and Arctic Slope
    Regional Corporation

9.    Subject to Motion to Transfer Venue, Consent to Removal by Defendants Dana
       Corporation and Dana Engine Controls

10.   Order for Conference and Disclosure of Interested Parties