\10

ORIGINAL

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

United States District Court
Southern District of Texas
FILED

APR 2 6 2002

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| **MICROTHERM, INC., ET AL** | * | |
| | * | |
| **vs.** | * | **C.A. NO. B-02 069** |
| | * | |
| **TRIQUEST-PUGET PLASTICS,** | * | |
| **L.L.C., ET AL** | * | |

**UNOPPOSED MOTION FOR LEAVE TO**
**FILE AMENDED COMPLAINT**

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

COME NOW Plaintiffs MICROTHERM, INC., MAVID MAQUILADORA and DAVID

E. SEITZ, in the above styled and numbered cause, and file this their unopposed motion for leave

to file an amended complaint, and as grounds therefore, would respectfully show unto the Court as

follows:

I.

Counsel for plaintiffs has been advised by counsel for Arctic Slope Regional Corporation

and Triquest Puget Plastics, L.L.C. that the correct parties are not named. Plaintiffs request leave to

amend the complaint to join the proper parties, specifically PUGET PLASTICS CORPORATION

and PUGET PLASTICS CORPORATION, S.A. de C.V.

A true and correct coy of the amended pleading is attached hereto as Exhibit "A."

WHEREFORE, PREMISES CONSIDERED, plaintiffs pray that they be granted leave of

court to file an amended complaint and for such other and further relief to which they may show

themselves justly entitled.

1

Respectfully submitted,

STEVE A. BRYANT & ASSOCIATES, P.C.

_____
Steve A. Bryant
Federal I.D. 2752
Texas Bar No. 03277900
3618 Mt. Vernon, Suite A
Houston, Texas 77006
713-526-7474 Telephone
713-526-7720 Facsimile

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing has been served upon all counsel of record as herein below noted:

William D. Wood
Graig J. Alvarez
Fulbright & Jaworski, L.L.P.
1301 McKinney, Suite 5100
Houston, Texas 77010
Attorneys for Defendants, Triquest-Puget Plastics, L.L.C. and Arctic Slope Regional Corporation

Eduardo Roberto Rodriguez
R. Patrick Rodriguez
Rodriguez, Colvin & Chaney, L.L.P.
P. O. Box 2155
Brownsville, Texas 78522

Timothy G. O'Neill
Brent D. Anderson
Snell & Wilmer, L.L.P.
1200 Seventeenth St., Suite 1900
Denver, Colorado 80202
Attorneys for Defendants, Emerson Electric Co. and Wiegand Appliance Division of Emerson Electric Co.

Peter Blute
11601 Katy Freeway, Suite 101
Houston, Texas 77079
Attorney for Defendants, Dana Corporation and Dana Engine Controls

by depositing same in the U.S. mail, first-class postage and/or certified with return receipt requested, via facsimile and/or hand delivery on this __25__ day of April, 2002.


Steve A. Bryant

## CERTIFICATE OF CONFERENCE

A conference has been held on the merits of this motion:

___    I have been unsuccessful in attempts to contact opposing counsel representing Defendants; therefore, it is assumed this motion is opposed.

x    I have been successful in attempts to contact opposing counsel representing Defendants; there is opposition to this motion.

___    I have been unsuccessful in attempts to discuss this matter with the opposing counsel as said attorney has not returned my telephone calls or responded to my letter.

___    This matter has been discussed with opposing counsel and no agreement on the motion could be reached.

___    Opposing counsel has been contacted and all counsel have come to an agreement on this matter; therefore, our Motion will not be presented to the Judge for hearing.

Steve A. Bryant

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| **MICROTHERM, INC., ET AL** | * | |
| | * | |
| **vs.** | * | **C.A. NO. B-02 069** |
| | * | |
| **TRIQUEST-PUGET PLASTICS,** | * | |
| **L.L.C., ET AL** | * | |

## PLAINTIFFS' SECOND AMENDED ORIGINAL PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

COME NOW **MICROTHERM, INC.** (*"MICROTHERM"*), **MAVID MAQUILADORA** (*"MAVID"*), **AND DAVID E. SEITZ** (*"SEITZ"*)**, INDIVIDUALLY,** hereinafter collectively referred to as Plaintiffs, complaining of **PUGET PLASTICS CORPORATION and PUGET PLASTICS CORPORATION S.A. de C.V., ("PUGET DEFENDANTS"), EMERSON ELECTRIC CO. and WIEGAND APPLIANCE DIVISION OF EMERSON ELECTRIC CO. ("WIEGAND DEFENDANTS), DANA CORPORATION and DANA ENGINE CONTROLS ("DANA DEFENDANTS),** and would respectfully show unto the Court the following:

### I.

### PARTIES

MICROTHERM, INC. is a Texas Corporation with its principal place of business in Harris, County, Texas.

MAVID MAQUILADOR, S.A. is a Mexican Corporation.

DAVID E. SEITZ, INDIVIDUALLY and as Licensor of Technology to other Plaintiffs,

1


**PLAINTIFF'S EXHIBIT**
*A*

who resides in Montgomery County, TX.

Defendant PUGET PLASTICS CORPORATION, is a foreign corporation conducting business under the laws of the State of Oregon and does not have a regular place of business in the State of Texas or a designated agent for service of process. For service of process this defendant may be served by serving the Secretary of State, Gwyn Shea, P.O. Box 12697, Austin, Texas 78711-2697 to be forwarded to Thomas R. Rice, President, Puget Plastics Corporation, 7440 S.W. Bonita Road, Tigard, Oregon 97224.

Defendant PUGET PLASTICS CORPORATION, S.A. de C.V., a subsidiary of Arctic Slope Regional Corporation is a foreign corporation conducting business in Guadalajara, Mexico and does not have a regular place of business in the State of Texas or a designated agent for service of process. For service of process this defendant may be served by serving the Secretary of State, Gwyn Shea, P.O. Box 12697, Austin, Texas 78711-2697 to be forwarded to Thomas R. Rice, President, Puget Plastics Corporation, 7440 S.W. Bonita Road, Tigard, Oregon 97224.

Defendant EMERSON ELECTRIC CO. has appeared and answered herein. For service of process, this defendant may be served with a copy of this second amended petition through its attorneys of record, Eduardo Roberto Rodriguez and R. Patrick Rodriguez, Rodriguez, Colvin & Chaney, L.L.P., P.O. Box 2155, Brownsville, Texas 78522 and Timothy G. O'Neill and Brent D. Anderson, Snell & Wilmer, L.L.P., 1200 Seventeenth St., Suite 1900, Denver, Colorado 80202.

Defendant WIEGAND APPLIANCE DIVISION OF EMERSON ELECTRIC CO. has appeared and answered herein. For service of process, this defendant may be served with a copy of this second amended petition through its attorneys of record, Eduardo Roberto Rodriguez and R. Patrick Rodriguez, Rodriguez, Colvin & Chaney, L.L.P., P.O. Box 2155, Brownsville, Texas

78522 and Timothy G. O'Neill and Brent D. Anderson, Snell & Wilmer, L.L.P., 1200 Seventeenth St., Suite 1900, Denver, Colorado 80202.

Defendants DANA CORPORATION and DANA ENGINE CONTROLS have appeared and answered herein.  For service of process these defendants may be served with a copy of this second amended petition through their attorneys of record, Peter M. Blute, 11601 Katy Freeway, Suite 101, Houston, Texas 77079.

Discovery is to be conducted under Level 3 of the Texas Rules of Civil Procedure.

## II.

### <u>JURISDICTION</u>

The court has jurisdiction over Defendant PUGET PLASTICS CORPORATION, a subsidiary of Arctic Slope Regional Corporation, a foreign corporation, organized and existing under the laws of the State of Oregon, because it has done business in Texas and has continuing contacts with Texas and is amenable to service by a Texas court.  The court has jurisdiction over the controversy because the damages are within the jurisdictional limits of the court.

The court has jurisdiction over Defendant PUGET PLASTICS CORPORATION, S.A. de C.V., a subsidiary of Arctic Slope Regional Corporation, a foreign corporation, organized and existing in Guadalajara, Mexico, because it has done business in Texas and has continuing contacts with Texas and is amenable to service by a Texas court.  The court has jurisdiction over the controversy because the damages are within the jurisdictional limits of the court.

The court has jurisdiction over Defendant EMERSON ELECTRIC CO., a foreign corporation, organized and existing under the laws of the State of Missouri, because it has done business in Texas and has continuing contacts with Texas and is amenable to service by a Texas

court.   The court has jurisdiction over this matter because the damages are within the jurisdictional limits of the court.

The court has jurisdiction over Defendant WIEGAND APPLIANCE DIVISION OF EMERSON ELECTRIC CO., a foreign corporation, organized and existing under the laws of the State of Alabama, because it has done business in Texas and has continuing contacts with Texas and is amenable to service by a Texas court.   The court has jurisdiction over the controversy because the damages are within the jurisdictional limits of the court.

The court has jurisdiction over Defendant DANA CORPORATION, a foreign corporation, organized and existing under the laws of the State of Ohio, because it has done business in Texas and has continuing contacts with Texas and is amenable to service by a Texas court.   The court has jurisdiction over the controversy because the damages are within the jurisdictional limits of the court.

The court has jurisdiction over Defendant DANA ENGINE CONTROLS  because it has done business in Texas and has continuing contacts with Texas and is amenable to service by a Texas court.   The court has jurisdiction over the controversy because the damages are within the jurisdictional limits of the court.

### III.

### **VENUE**

Venue is proper in Cameron County, Texas, pursuant to Texas Civil Practice & Remedies Code §15.002a(1) & (3).

IV.

## BACKGROUND

Plaintiffs in this case are Licensee's under patents for the SEISCO® electronically controlled tankless water heater. It is believed that this type product will some day replace the conventional water heaters found in homes today. Plaintiffs wanted to manufacture these water heater products and to sell them to the building industry including manufactured homes. Anyone who purchases and uses a water heater has generally enjoyed very reliable performance, therefore the expectation of any customer for his or his client's water heater is very high. Reliability results from good design, and good manufacturing with reliable component parts. Three of the most critical components in Plaintiffs' electronically controlled water heater are (1) the heating elements, (2) the temperature sensors that provide very important water temperature information necessary for safe and reliable performance, and (3) heating chambers (heat exchanger) which are made from high performance engineering plastics. If the screw plug of heating elements used in any water heater cracked and leaked water, or the temperature sensors were defective and shortly after installation gave bad temperature readings to the heater's control, or a high percentage of the heat exchangers of a water heater failed within the first year by cracking and leaking water customers of the manufacturer of the water heater would loose confidence and refuse to purchase his product. In fact, any one of these kinds of failures in the products of a single water heater manufacturer would cause his. If that same manufacturer had all these failure problems with his water heater he could not for long stay in business. Obviously, these critical components need to be suitable for their application, free of manufacturing defects in order to provide reliable performance and reasonable service life under the normal conditions experienced by "tankless on demand water" heaters.

5

Plaintiffs would show this Honorable Court that they had developed a genuine sense of trust in their relationship with Defendants.

Plaintiffs would show this honorable court that between the years of 1999 and 2001 each of the Defendants individually were vendors to Plaintiffs and each represented themselves to said Plaintiffs

1. to be leading manufacturers in their fields;

2. with extensive experience and expertise in the design and manufacture of their respective products;

Plaintiffs would show this Honorable Court that PUGET PLASTICS CORPORATION and PUGET PLASTICS CORPORATION, S.A. de C.V., a subsidiary of Arctic Slope Regional Corporation, were experts or at least held themselves out as experts in plastics and/or molding and had specialized knowledge in the following areas:

1. selection and utilization of injection molding equipment suitable for properly molding Plaintiffs' water heater parts;

2. development of processing parameters to insure the best and strongest part;

3. design tooling changes to improve the utilization of Plaintiffs molds and processing parameters;

4. evaluation of toolmakers;

5. review of tooling modifications during manufacture;

6. approval of finished tooling;

7. processing the selected engineering resin material into final parts;

8. evaluation of the processing parameters to insure optimum part strength and integrity;

9. assurance of a part quality and quality control;

6

10.     maintenance of its customer tooling in a first class condition;

Plaintiffs will further show that PUGET PLASTICS CORPORATION and PUGET PLASTICS CORPORATION, S.A. de C.V., a subsidiary of Arctic Slope Regional Corporation

1.     recommended tooling changes for Plaintiffs heating chamber mold that were represented to improve the performance of the mold and allow the mold to be used in smaller molding machines to reduce the overall cost of molding;

2.     assured Plaintiffs that such tooling work was to be performed by Taller Mendoza;

3.     agreed to take ownership of these tooling modifications and guarantee their ultimate performance;

Plaintiffs will show that Defendants EMERSON ELECTRIC and WIEGAND APPLIANCES

1.     represented themselves to Plaintiffs as the leading independent manufacturer of very high quality heating elements for appliances in the U.S.

2.     represented themselves as experts in the evaluation of heating elements in various applications;

3.     represented themselves as experts in the recommendation of the type and specifications for heating elements for fluid heating applications;

4.     recommended that Plaintiffs change the type of heating element used from one with a plated steel screw plug to a solid brass screw plug in order to provide better long term performance in aggressive water conditions and to prevent corrosion;

5.     charged Plaintiffs substantially more for what Defendants represented as a much superior heating element screw plug;

Plaintiffs will show that Defendants DANA CORPORATION and DANA ENGNE CONTROL

1.     held itself out to be recognized as a global leader in the design and manufacture of temperature sensing devices;

2.    represented its devices were manufactured in a quality and workmanlike manner

3.    their temperature sensing devices, (thermistors) as used by Plaintiffs are suitable and reliable for demanding temperature measurements of water;

As Defendants are all recognized as major leaders in their respective fields, Plaintiffs were very comfortable in following their recommendations and using their products or services. Defendants, after gaining the confidence of Plaintiffs, recommended their own respective products and/or services initially and continued to recommend them and represent them as suitable for Plaintiffs application, even after Defendants were provided with failed parts and knew or should have known, not only that the reasons for the failures were their own manufacturing processes, but also knew the immediate remedy. Defendants either pleaded ignorant to the problems or blamed the failures on extraordinary circumstances including their own vendors and assured Plaintiffs with each new lot of product that the failures were not likely to reoccur.

In July of 1999, Plaintiffs were introducing their new microprocessor controlled version of the tankless water heater. This is a very sophisticated product and relies heavily on quality parts and it was just after this introduction that Plaintiffs began to receive parts for Defendants that had concealed manufacturing defects.

Plaintiffs would show that the first problem began with special heating elements provided by the Wiegand Defendants. Defendants had induced Plaintiffs to change over to a much more expensive immersion heating element with a solid brass screw plug. Very shortly thereafter Plaintiffs who were pressure testing every element purchased began discovering a small percentage of brand new elements in their shipping boxes whose screw plugs had cracked. When David Seitz, President of Microtherm, Inc. contacted Mr. Dick Feather presenting him with the problem and

8

providing him with samples, he was told that this problem occurred because the Wiegand Defendants had been sold a quantity of bad brass screw plugs. Mr. Feather indicated that the Wiegand Defendants had resolved the issue and there shouldn't be any more problems. Neither Feather or anyone else at the Wiegand Defendants had contacted Plaintiffs to advise them prior to this time that the Wiegand Defendants had a potential problem with parts it sold Plaintiffs. Shortly thereafter Mr. James Albert, the Q.C. manager for a sub contractor for Plaintiffs received a letter from The Wiegand Defendants indicating the problem was a manufacturing issue at the The Wiegand Defendants facility involving over-stressing the part by over staking the screw plug upon installation of the heating coil. When asked about this issue by Seitz on or about August of 1999, Mr. Feather continued to insist that the problem was the total result of bad brass purchased in the past and that the problem was resolved. Furthermore Feather indicated that the Wiegand Defendants were making a very strong effort in improving its own quality control over the brass materials it was purchasing to insure this did not happen again. Feather confirmed what Plaintiffs were later to find out. The defects in the brass, whether over-stressing or quality of brass is concealed and very hard if not impossible to detect without destructive testing. Plaintiffs had to rely on Defendants expertise and representations that the problems were resolved. The failures did continue, however, albeit their were smaller quantities of failures in the newly delivered parts. The failures in actual water heaters installed during this 1999 period were very small. From that point on lots were tracked by date along with failures in the field. Failures from installed water heaters started to increase late in the year 1999 from parts with latent stress defects but the Wiegand Defendants continued to blame these failures on alleged same limited bad batch of brass screw plugs. The Wiegand Defendants represented to Plaintiffs that it had changed over to making the

brass screw plugs themselves rather than buying them from outside vendors and that they would be able to control quality and prevent these types of product defects.    When failures continued to occur in different lots of heating elements, Feather represented that these were probably made from the same material.  Then suddenly the products delivered to plaintiff by these defendants no longer experienced cracking.  Plaintiffs were then told that the staking process had been slightly modified and that was insuring better parts.  The Wiegand Defendants had manufactured elements for month after month for over 6 months that continually had failures and was able to stop the problem with a single manufacturing change.    Plaintiffs have since discovered that such staking issues are commonly known to the manufacturers of heating elements and that procedures and manufacturing specifications for staking have been developed and used to prevent this very type of problem.

The Dana Defendants purchased a company or companies which had previously sold temperature sensors to Microtherm, Inc. or its predecessor Therm-O-Lator Inc.    The Dana Defendants are a large publicly held company which specializes in automobile parts.    The temperature sensors purchased by Plaintiffs were a type commonly used in the engine blocks of cars to report engine water temperature.  These devices had to be reliable and suitable for the very demanding application in which they were used.  It was because of the long history of reliable use that Plaintiffs felt confident in the Dana temperature sensors for its water heater.  The temperature curves for use in an automobile and that of Plaintiffs water heater were very similar.  Dana Defendants had up until December of 1999 manufactured the sensors sold to Plaintiffs in Alabama. On or about December of 1999, the Dana Defendants moved its manufacturing from Alabama to Brownsville, Texas and Matamoros, Mexico just west of the Gulf of Mexico.

On or about June of 2000, Plaintiffs began observing problems with incoming temperature

10

sensor parts. Some would check out fine on incoming Q.C. then fail upon system checking the heater. The numbers of these failures were small but Plaintiffs engineer David Berryhill reported the problem and Plaintiffs subcontractor's engineer Juan Carlos Cabello also discussed his findings with a Mexican engineering firm, which was working with Dana. A plant engineer had indicated to Juan Carlos that there had been some contamination problems in earlier lots and perhaps Plaintiffs had received a few of these. For the balance of the year, increasing problems were occurring with installed heaters, which Plaintiffs originally believed were probably due to control board failures. Control boards were replaced, even heaters, and from about October of 1999, through January of 2001, there was increasing evidence that the failures were caused by the defective temperature sensors. Then in January the Dana engineers disclosed that the temperature sensing devices were in fact contaminated. Plaintiffs did not know what "contamination" meant as it applied to the sensors but Dana's representatives continued to assure Plaintiffs that the problem was small and isolated to earlier lots and that they had truly resolved the problems. By January of 2001, the failures were occurring at an alarming rate. On or about March of 2001, Plaintiffs sent parts to outside experts to evaluate failed parts and discovered that the entire inside of the brass enclosed sensor assembly was corroding to the point that it looked like the parts had been soaked in salt water. Plaintiffs stopped paying for the parts and contacted the Dana Defendants both in Alabama and in Brownsville, Texas.

On or about September of 1999, after having minor tooling modifications made to a large heating chamber mold, Plaintiffs were considering two molders for the job of producing plastic parts for Plaintiffs newly improved tankless water heater. Plaintiffs interviewed Supreme Plastics out of Gladewater, Texas, and were contacted by a representative of Puget Plastics for their

Guadalajara molding facility. Puget was at that time an extremely well respected molder and had built a multimillion dollar state of the art facility in Guadalajara, Mexico to service the requirements for Hewlett Packards' Mexico manufacturing. Plaintiffs were assured that Puget in Guadalajara was looking for diversified molding applications and Plaintiffs product was of particular interest to them. They represented that they were using their own staff of experts from their Tualalitin, Oregon facility and that every contract or obligation that involved molding in Guadalajara was in fact not only considered made but fully guaranteed by Puget Plastics, Tualatin and its owners Arctic Slope. This point was stressed and reinforced by demonstrating that the employees and management at the Guadalajara facility did not change their business cards which reflected their addresses as being Puget Plastics in Tualatin. Plaintiffs agreed to the Puget Defendants' request to send Plaintiffs molds at considerable expense to Guadalajara to enable Defendants to properly survey the condition of Plaintiffs molds and processing requirements. After the molds were delivered, Puget Defendants had Plaintiffs molds surveyed and carefully checked. Puget Defendants advised Plaintiffs that they wanted the opportunity to have Plaintiffs business and would handle the account in a very special manner.

Plaintiffs had, over the years, worked with and developed a high level of confidence with Tony Mendoza, of Taller Mendoza in Guadalajara. Seitz was told that Puget had entered into a partnership with Taller Mendoza for mold repairs and mold manufacture. Mendoza told Seitz that his involvement with Puget was related to tooling support, and while his company had no relationship in Puget's molding operation, it was his understanding that Puget was doing a good job in its molding operations for major U.S. companies.

12

On or about December of 1999, the mold that makes the chamber parts for the Seisco water heater was sent to Puget.  On January 28, 2000 a meeting was called by Andre Saverlieff, (Andre), Puget's Plant Manager for the purpose of concluding agreements between Puget and Plaintiffs so that he could schedule Puget's production of all the plastic parts required by Plaintiff for the Seisco® water heater. Seitz made a special trip from Houston, TX, at Andre's request, to attend the meeting.

At the meeting, Seitz provided Puget with set-up and sequence information in an attempt to insure the safe operation of the chamber mold.  Seitz provided and signed off on sample "QC" parts.

During this January 28 meeting, Seitz explained that Mavid's technicians were not plastic experts but rather contract manufacturers for the Plaintiffs.  Seitz confirmed to Andre that Microtherm, Inc. a Texas Corporation was fully responsible for all P.O.'s for materials molded, as well as the materials provided.  Seitz made it clear that given the circumstances and based on his reliance for tooling support from Defendant Puget's joint venture with Mendoza, Plaintiffs were willing to have Puget mold the parts.  Seitz made it clear that he was absolutely relying on Puget to conscientiously perform its molding to insure quality parts.  Seitz emphasized the fact that these parts were to be used in water heaters for residential use and that no one could afford to have inferior plastic parts crack in this application.  Seitz was again reassured by Andre that Puget Plastics of Tualatin, had a history of quality or they could not mold for companies like Boeing and H.P.  Furthermore it was represented that Puget in Guadalajara was part of and the same as the Puget Plastics Company of Tualatin, both being owned and controlled by Arctic Slope.  In this case, Puget Plastics of Tualatin was in immediate control, and along with Arctic

13

Slope stood behind all the commitments, and work performed by Puget's Guadalajara plant. He stated "It's for that reason my business card and that of others here shows our address as the Corporate offices in Oregon."

The chamber mold was installed in a Puget machine on or about February 1, 2000, but within just a few hours the mold was damaged as a result of improper operation. By February 15, 2001 Puget, however, had delivered over 1,800 chamber parts. Then between the period of February 15, 2001, and May 8, 2000, Puget as a result of absolute negligence crashed and damaged this mold 4 more times, and was unable to timely deliver parts to Mavid for Plaintiffs' water heater requirements. In one such case a night supervisor had deliberately disabled a safety switch. Each time the mold was damaged, Puget's Andre Savelieff assured Seitz that they would fix the tool and correct the problem. This process soon became a loop that Seitz felt Plaintiffs could not free themselves from without greater serious financial harm.

Much of the tool damage to the chamber mold resulted from Puget's inability or refusal to maintain proper and safe operation of a small side core that made a hole horizontally between the two chambers of the chamber part. During operation this core had to be inserted into the side of two larger cores and then removed. If the large cores were not properly set or if the operator tried to lower the large cores before removing the side core the cores would crash against one another causing significant damage.

Seitz soon discovered that Puget had modified the main cores cutting off the solid end and replacing them with sacrificial inserts. If the mold was improperly operated the end would break off and they would only replace that part. This was done without Seitz's or Microtherm's approval.

Seitz was upset with this approach, as it did not attempt to maintain safe operations which prevent the reasons for the problem but rather only to reduce the damage. Seitz also observed very poor processing conditions by Chuck Fletcher the manager for material processing for Puget. Seitz discovered that Chuck was not properly drying material and in one case was knowingly trying to operate a machine with a heater band on the barrel inoperative. Chuck lied and was found out as soon as the band was checked with an amp meter and the material was checked for moisture.

Andre had required Fletcher to personally apologize to Seitz and convinced Seitz that he would personally make sure that Fletcher did things right. It was discovered later that from that day forward there was a succession of events resulting from conditions which Fletcher allowed or knowingly created causing damage to the molds or poor product quality.

Seitz had sent David Berryhill, a mechanical engineer to Guadalajara in May to meet with Chuck Fletcher, Puget's process manager, and Tony Mendoza to discuss possible additional tooling modifications that could possibly reduce or eliminate the potential for continuing damage and allow Puget to operate the mold in a smaller machine.

Puget then recommended that Plaintiffs allow Puget to install a mechanical slider in lieu of a piston operated side core. Puget represented that this modification would eliminate the opportunity for operator error in the proper timing when moving this core, which had to enter and leave the top part. Seitz spoke with Mendoza and was assured that such a modification could be properly done and should relieve the potential problem. This was a major modification because once it had been done, substantial changes would be made to the mold such that it would be extremely difficult and very expensive to try to return to the original design. For that reason

Plaintiffs wanted no one but Mendoza to do the work. Puget agreed and represented that this modification would be performed by Mendoza.

Additionally Puget recommended that the main core piston assembly be modified to reduce the height requirements. According to Puget this would allow them to install the chamber mold in a smaller machine which would allow them to provide lower costs per part to Plaintiffs.

Plaintiffs agreed to both modifications asking only that Mendoza complete the work as Puget had represented on a staggered schedule with the slider modification to be completed by the first week of May (6 weeks).

It was in fact not until after 5/15 that the tool with this modification was delivered to Puget. The mold was installed and operated for less than 4 hours when the new slider broke. It was then that Seitz, believing that Mendoza had not done the modifications, discovered in fact that Puget had lied to him and taken the work to a company called Tooling Science a shop next door to Puget's plant. The assembly was poorly designed and each time the mold closed the slider was forced into a bind preventing the proper insertion of the side core. From 2/15/00 to 5/30/00 because of continuing tool problems related to this modification Puget failed to deliver a single chamber part to Mavid. Then on 5/31/00 Puget started delivering partial shipments between repeated breakdowns of the slider.

Plaintiffs were now experiencing his worst nightmare. This tool could not be changed back without a great deal of time and expense, Plaintiffs were deprived of parts contracted for by Puget and had to continue to rely on more of Puget's assurances that they would correct the problem. Seitz called Mendoza and insisted that he take responsibility for making sure that the issue was corrected. As it turned out, Puget finally discovered that the mold modification had

been made in such a crude manner and without proper supervision that the slider base was offset. When the mold closed the opposing side of the mold actually acted as a wedge forcing the whole assembly upwards. This caused the core to try and enter the mold at an improper angle, galling it and finally it bent and then broke the assembly's attachment bolts. Puget used a grinder to cut away the excess and Mendoza made new cores, which temporarily resolved this issue.

Puget had still not disclosed an even greater concern. This arose from the use of a molding machine having a very large material capacity. Because of this large capacity in relationship to the parts requirement and the molding time per part, substantial excess material had to stay in the hot barrel (oven) for a long time. If proper molding temperatures were maintained, this material would burn and degrade. This degradation would be so apparent that any such part would have been rejected. For this reason, Puget's Fletcher had reduced the molding temperatures 100°F. below DuPont's recommended molding temperatures. The lower temperature eliminated the degradation in the barrel but created a condition in which cooler material was being forced around the core and when the flow of material met it was not sufficiently fluid to properly bind (weld). By molding at these temperatures he was able to mold parts that had every appearance of good parts but in fact were significantly weakened at the areas where the material met after flowing around the cores. (weld lines or joints). In addition, there is evidence that many parts were molded when the mold was leaking oil. Without microscopic structural analysis, this type of weakness would not be visible. On the other hand any experienced molder knows, as those involved at Puget had to have known, one of the inherent problems with cold molding is poor weld line strength and increased molded in stress.

Seitz traveled to Guadalajara again the end of June, and at that time discovered that Puget had wasted and/or destroyed substantial quantities of the plastic resin materials that had been furnished to Puget by Plaintiffs. Plaintiffs were entitled to have received credits against Puget's invoices to Mavid for materials furnished. As it turned out substantial amounts of material were wasted during improper molding or destroyed by Puget's mishandling of the material. Plaintiffs insisted on an accounting and proper credit.

Subcontractor Mavid continued to offer assistance and people to attend molding operations and to the extent of their limited experience provide helpful instructions to the Puget Q.C. staff. Puget not only refused such offers but on or about the last week of June 2000, Chuck Fletcher not only refused to permit any help but actually terminated all production for Mavid/Microtherm because James Albert, a QC manager for Mavid discussed part quality with a Puget Q.C. person.

This shutdown was a last straw. Seitz sent a letter styled "Formal Notice and Demand" reiterating the terrible losses that Microtherm/Mavid were having to suffer from Puget's breach of contract, and misrepresentation. In this letter Plaintiffs again demanded an accounting and credit from Puget for wasted or destroyed material.

Dale Behm, President of Puget Plastics Corporation responded on 7/3/00 with a promise to have Andre Savelieff as Puget's representative make sure that the issues are properly resolved.

Andre and Seitz met in Guadalajara on July 4th to discuss the issues. From that meeting Plaintiffs and Defendants came to an agreement in principle that appropriate credits from Puget would be given and that Plaintiffs would allow Puget to employ Mendoza to change the main piston core assembly in order to reduce the length of the mold and allow Puget to mold the

chamber parts in a smaller machine more cost effectively. At this time Puget had still not disclosed the fact that they were molding these parts in improper equipment, in an improper manner at improper temperatures.

On August 28, 2000, Plaintiffs discovered that Andre had left the position of Plant Manager and returned to Oregon, and that critical plastic parts had still not been manufactured and delivered to Mavid. Seitz personally made arrangements to travel to Guadalajara for a special meeting with the new plant manager, Tony Lueke. When Seitz arrived in Guadalajara he was advised that Lueke had decided not to show.

After returning to Houston Seitz wrote Behm an e-mail advising of this incident and the fact that Seitz had just discovered that Monday, the 28th of August in a meeting with Mendoza, that the mold modifications approved by Plaintiffs, with respect to the main piston assembly, had never been started.

Behm responded personally on Sept 1, 2000. He assured Seitz the "Andre will stay involved and assist me in solving the issue."

Seitz replied the same day to Behm's e-mail and expressed a grave concern over Puget's continued default. Seitz advised Behm that Plaintiffs were holding Puget responsible from that date forward for the losses incurred.

Plaintiffs were in the worst of situations with the principle mold undergoing long overdue modifications under Puget's supervision with a completion date uncertain, coupled with the continued default of Puget to provide Plaintiffs desperately needed parts for which they contracted.

On September 1, 2000 Seitz faxed to Behm his understanding of their agreement to move forward. Seitz again advised Behm that Plaintiffs continued to rely on Puget for performance and asked Behm to advise Seitz if this letter did not contain what was also Puget's understanding of the agreement.

On or about September 14, 2000 Seitz accompanied by a representative of DUPONT, traveled to Guadalajara.. Seitz had agreed to meet with Andre, Tony Luethe of Puget and Tony Mendoza of Taller Mendoza to discuss the tooling issues and the accounting of Microtherm's outstanding balance after credits due from Puget. First the meeting included a discussion of tooling and Mendoza provided Seitz with an updated estimate of expense for the modification required to redesign the main core piston assembly and a time for completion. Mendoza and Luethe confirmed that Mendoza's shop would do the design and work. Luethe and Seitz dismissed themselves to a side office and discussed Plaintiffs' account balance. Luethe disclosed to Seitz that he was very much aware that substantial credit was owed to Plaintiffs and that when these were given there would no balance owing to Puget for past work. Luethe further advised Seitz that he was also aware of the wasted and destroyed materials and in fact on one of his visits he personally observed a forklift operator, at the unloading dock, run his fork lift into a pallet full of Plaintiffs' very expensive Radel resin and tear bags causing the resin to be discharged all over the driveway. Luethe promised and assured Seitz that the future would be different and that Puget sincerely wanted to be the molder for the Seisco parts.

After this discussion Seitz and Hines were escorted to the molding area at which time Fletcher and an engineer for DuPont were in heated discussion over molding temperatures for one of the Zytel parts. Puget was molding at almost 100 degrees F below DuPont's

recommended process temperatures. Fletcher was arguing that the DuPont recommendations were only guidelines and that in fact good parts could be obtained at these low process temperatures. Seitz was appalled and deeply concerned, expressing his concerns. The very next day Seitz asked to be provided the molding parameters for all the tools including the chamber tooling. This is the first time that the Plaintiffs' found out that Puget was circumventing the letter and intent of Dupont's processing guidelines for the DuPont Zytel material.

Fletcher and Luethe continued to argue that good parts could be made even under these conditions. Nevertheless Seitz was concerned and reiterated that while he was not a processing expert that Puget needed to be reminded that these parts needed to be very high quality as they were water heater parts, which would be installed in customers' homes.

Luethe explained that he was a processing expert and continued to contend the parts were fine.

Plaintiffs had been assured the tooling modifications from Mendoza would be completed no later than September 25th. Then to Seitz's surprise, on Friday September 22 only three days before "Mendoza" was supposed to complete the modifications, Seitz again discovered that the very important work was not being done by Mendoza, in fact not even designed by Mendoza but rather by the same shop next to Puget's plant. Seitz was extremely concerned and insisted that Puget coordinate the initial evaluation of the tool performance with the modifications be scheduled with Mr. Joe Rebollo, a DuPont engineer, so that he or his representative could attend.

On October 6th, after continued delay Puget on its own decided to run the chamber mold at night, a time when Mr. Joe Rebollo from DuPont could obviously not attend. James Albert, Mavid's QC manager found serious quality problems with the initial parts. Seitz then received a

message from Agustin, an employee of Puget, that Puget had run 10 more parts and unless we were prepared to accept the quality of these parts that Puget would take the mold down and not run production.  Those specially picked 10 parts appeared acceptable to James.  What James and Seitz did not realize was that the new modifications so long awaited did nothing to solve the problem.  James was not aware of nor qualified to understand that while Puget had changed machines, they did so deliberately to deceive Plaintiffs.  They were still using a very large machine, which had only slightly less resin capacity than the original.  Puget discovered that the designs for both of the modifications to the mold that they had supervised were not curing the problems.  The first modification for the slider was weak and broke within hours of the first production and continued to fail.  Furthermore the second modification to the main cores piston assembly added additional width, which gave rise to an entirely different problem for Plaintiffs. A molding machine has two absolute dimensions that being the height from the nozzle to either the floor or in the case of Puget's machines a cross member which inhibited the use of full height and the width of the tie bars for the platen. Puget had reduced the height of the mold but increased the width such that it not only did not fit between the tie bars for Puget's smaller machines but would also prevent Plaintiffs from using the mold in other types (makes) of machines which otherwise would have accommodated the mold's original height.

Puget deceived Plaintiffs from day one about having an available machine that had a suitable resin capacity plus clamp tonnage capacity in which the chamber mold could have been used.

As stated above no sooner had Puget began to try and run parts with the newly modified mold but it broke again.  This time it was sent to Mendoza for repairs.  Mavid got only 278 parts

for chambers after 2.5 months of waiting. Mavid's production was and had been shut down off and on for over a month and now October 2000 Plaintiffs product was completely shut down again.

The mold was reinstalled and production was being run Saturday the 14th of October. James Albert the QC manager for Mavid was at Puget observing this process. Seitz contacted James on his cell phone and asked him to get the mold process temperature parameters from the supervisor. The supervisor would not initially give them to James. Seitz then asked him to go to the machine and write down the temperatures. The next day on Sunday, James had an opportunity to view and record process temperatures of about 460 degrees F. These were the same as used before the modification. Seitz insisted that James find out why they were still processing like this. James was able to get this information within a few minutes. James advised Seitz that he was informed by a Puget supervisor from Tualatin that contrary to all the assurances Puget could not use the mold in a smaller machine because of the new width and in fact did not have a machine with proper resin capacity available at that time anyway.

Seitz was in disbelief. He had been told by Luethe that the reason for running at lower temperatures was the viscosity of the DuPont materials. Luethe and everyone else at Puget claimed they were using the hot oil mold temperature control during the processing. Even this was a lie.

That Sunday, October 15, 2000, Luethe was off again on another vacation in Oregon. Seitz e-mailed Luethe and asked him to call him and provide an immediate explanation for what was a series of misrepresentations to Seitz.

Luethe did not call and refused to accept Seitz's calls even after he returned to Guadalajara. Seitz was told by James and Marco Hernandez of Mavid that Puget intended to resume molding that week on Thursday or Friday.

After no further communications, on Friday night October 20, 2000, at about 7:00 pm, Seitz received a call at his residence from Luethe advising him that Puget had made a decision to take the chamber mold down and refused to mold the Plaintiffs plastic part requirements.

During the period of time from January 2, 2000 to October 31, 2001, purchase orders for 5,100 chamber parts alone were issued. These purchase orders were accepted by Puget. Puget delivered 4,329 parts that were in great part reluctantly accepted because of the great need. Almost 20% of all parts received were rejected. The 671 parts not delivered plus the replacement of at least 800 rejected parts would have made over 730 four chamber water heaters or at least 2 ½ months requirements.

This is not the whole story. Because of the defaults of Puget, delays were incurred during the time when modifications of the tooling were allegedly being made. This down time as it turns out was completely unnecessary. Plaintiffs lost at least 3 months each of production, hundreds of sales and sales opportunities, the dead expense of maintaining their respective operations. Since plaintiffs Industriales and Microtherm are responsible for all the Mavid funding, the expense, as puget was already aware, was totally that of these two Plaintiffs. The combined expense exceeded $200,000, not counting any loss of sales or the loss of customers, and the extremely high warranty replacement and service cost for heaters which failed from cracked plastic parts molded by Puget.

24

From January 2001 until the present, there have been well over 200 failures of water heaters increasing at a current rate of over 40 per month. These failures are the direct result of weak weld lines I the heating element boss. This type failure has not been seen in any other parts molded since 1995 except for the Puget molded parts and for six parts molded in January of 2001. In the case of these six part, there was a small and very short lived contamination from leaking oil in the mold.

A great many important customers have been lost and innumerable other poatential customers as a result of a loss of confidence in the Seisco water heater resulting from these failures. Included in a HUD owned housing authority project in Alabama in which all 66 heaters are being replaced. All failed from cracked chamber parts molded by Puget. Plaintiffs' product was recommended to the housing group and installation in part subsidized by the TVA and a great many builders in the Virginia and Maryland areas.

Plaintiffs have invested a great deal of money in developing the TVA relationship, as well as that of the builders in Virginia and Maryland, and the manufactured housing market. The loss of confidence has truly cost plaintiffs dearly.

Based on representations made by Defendants and their agents, Plaintiffs materially altered their position and focused solely on Defendants for materials, and technical support. As a result of this reliance on Defendants' false representations and promises, Plaintiffs were damaged by expending substantial amounts of money with Defendants defective products and/or services and by losing years of time in their attempts to complete the development, commencement of production and sales of their product. In addition, Plaintiffs have expended large sums of money in mitigating their damages and effectuating "cover" as defined in the Tex. Bus. & Comm. Code.

V.

## **BREACH OF CONTRACT**

All of the allegations heretofore set out are incorporated herein for all purposes.

Plaintiffs and Defendants were parties to legally binding agreements. Upon trial hereof, it will be shown that Defendants breached their part of the agreement in at least the following particulars:

1.  Failing to provide necessary technical support required for the successful manufacture of Plaintiffs product.

2.  Failing to provide guidance in materials selections but in fact misleading Plaintiffs.

3.  Providing Plaintiffs with misleading and false representations (or inferior recommendations) with respect to Plaintiffs' tooling modifications.

4.  Providing Plaintiffs with misleading (or inferior) representations related to the level of Puget's technical review and evaluation of Plaintiffs' design, parts and tooling.

6.  Defendants' failure to provide Plaintiffs' with recommendations of alternate materials which in fact would have been more suitable for Plaintiffs application and intended use.

7.  Misrepresenting the suitability of parts manufactured for Plaintiffs' product.

8.  Misrepresenting the nature, quality and extent of services that would be provided.

9.  Failing to perform all those matters set forth in paragraph II of this petition. Such allegations are incorporated herein by reference.

In addition to its right to bring this action under common law principles, Plaintiffs would show that the acts and omissions heretofore set forth violate Article 2 of the Uniform Commercial Code as adopted by Texas in the Texas Business & Commerce Code. In addition to all other rights and

26

remedies for breach of contract, Plaintiffs would show that they are entitled to recover those statutory remedies set forth in the Texas Business & Commerce Code.

As a cause of Defendants' breach of contract and violation of Article 2 U.C.C., as adopted by Texas, Plaintiffs have suffered damages as hereinafter set forth.

VI.

## DECEPTIVE TRADE PRACTICES

All of the allegations heretofore set out are incorporated herein for all purposes.

All Plaintiffs have complied with all conditions precedent to the recovery of damages under the Texas Deceptive Trade Practices Act. Upon trial hereof it will be shown that Defendants violated the Texas Deceptive Trade Practices Act in the following particulars:

1. Falsely representing certain products marketed and manufactured by Defendant were suitable for Plaintiffs' application.

2. In causing Plaintiffs to continue expending money and time on service and repairs when Defendants knew or should have known that the products they provided, were defective and would fail in Plaintiffs water heater application.

4. Representing that Defendants would provide those services, support, and assistance outlined in paragraph II of this amended petition when they had no intention of providing those services or, alternatively, the degree or qualify of services promises.

Defendants conduct was committed intentionally and knowingly. The conduct of Defendants violates the Deceptive Trade Practices Act in the following particulars:

a) causing confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services (§17.46(b)(2));

b) representing that goods or services are of a particular standard, quality or grad, or that goods are of a particular style or model, if they are of another (§17.46(b)(7));

27

c)   disparaging the goods, services, or business of another by false or misleading representation of facts (§17.46(b)(8));

d)   knowingly making false or misleading statements of fact concerning the need for parts, replacement, or repair service (§17.46(b)(13);

e)   the failure to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed (§17.46(b)(23);

f)   engaging in an unconscionable action or course of action as defined in §17.45 Tex. Bus. & Comm. Code; §17.50;

k)   breaching express and implied warranties. §17.50 Tex. Bus. & Comm. Code.

As a proximate cause or, in the alternative, a producing cause of the conduct set forth above, Plaintiffs have suffered damages as hereinafter described.

VII.

## FRAUD AND MISREPRESENTATION

All of the allegations heretofore set out are incorporated herein for all purposes.

During the course of Plaintiffs' dealings with Defendants, Defendants made many statements of material fact which they knew to be false when made or were made without regard and/or without knowledge of their truth or falsity, or, alternatively, were negligently made. Such statements were made for the purpose of inducing Plaintiffs to act or refrain from acting and Plaintiffs relied on such misrepresentations to their detriment. In addition to false representations, Defendants made statements that were literally true which were used to create a false impression. At all material times hereto, Defendants had a duty to speak and their mere silence is equivalent to a

false representation.    Defendants committed fraud and misrepresentation in the following particulars:

1.    representing that products were manufactured in a good and workmanlike manner free of known defects.

2.    representing that such defective parts were suitable components for Plaintiffs' application;

3.    failing to advise Plaintiffs of testing that had been conducted by Defendants which revealed that parts that were being sold and delivered to Plaintiffs had concealed manufacturing defects and not suitable for Plaintiffs' application;

4.    deliberately concealing manufacturing defects by blaming others for failures of Defendants products;

5.    failing to disclose material facts to Plaintiffs which would have affected their decision to utilize the parts and services.

As a result of Defendants' fraud and misrepresentations, Plaintiffs have suffered damages as hereinafter described.

VIII.

## NEGLIGENCE

All of the allegations heretofore set out are incorporated herein for all purposes.

Upon trial hereof, it will be shown that Defendants were negligent and such negligence was a proximate cause of Plaintiffs' injuries and damages.  Defendants were negligent in the following:

a)    in failing to properly test its products;

b)    in failing to follow prudent manufacturing guidelines and specfications

c)    in making false representations and engaging in those acts and omissions described in paragraph VI of this petition;

d)    in providing the services it agreed to perform as previously outlined herein.

29

IX.

## BREACH OF WARRANTY

All of the allegations heretofore set out are incorporated herein for all purposes.

Defendants breached the following warranties which were a proximate cause or, in the alternative, a producing cause, of Plaintiffs' damages:

    a)      warranty of fitness for a particular purpose;

    b)      warranty of merchantability.

X.

## ACTUAL DAMAGES

All of the allegations heretofore set out are incorporated herein for all purposes.

As a proximate cause or, in the alternative, a producing cause of the acts, omissions, fraud, misrepresentation, breach of contract, breach of warranties, negligence, and violations of the Deceptive Trade Practices Act, Plaintiffs have suffered the following items of damages:

    a)      lost profits, past and future;

    b)      damages caused by increased warranty and overhead costs;

    c)      damages for cover, i.e., finding a suitable replacement;

    d)      the value of the materials that were wasted;

    e)      damages caused to customers' homes and businesses;

    f)      loss of goodwill;

    g)      attorneys fees.

In addition to those items specifically enumerated above, Plaintiffs would show that they are entitled to recover prejudgment and post judgment interest, and additional damages as

authorized by the Deceptive Trade Practices Act. Plaintiffs' total damages greatly exceed the minimal jurisdictional limits of this Honorable Court.

XI.

**EXEMPLARY DAMAGES**

All of the allegations heretofore set out are incorporated herein for all purposes.

The conduct of defendants were intentional, willful and evidence of a conscious disregard for the rights of others. Plaintiffs request that they be awarded to deter such conduct in the future. Plaintiffs request exemplary damages in an amount which the jury deems appropriate after weighing the evidence.

XII.

Plaintiffs' demand a jury trial.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray that upon final hearing hereof they have and recover of and from the Defendants, jointly and severally, such actual, special and consequential damages as the jury finds just and reasonable, together with interest, attorneys fees, prejudgment and post judgment, court costs, punitive damages, and additional damages authorized by the DTPA, and for such other and further relief, both general and special, at law and in equity, to which Plaintiffs may show themselves justly entitled.

Respectfully submitted,

STEVE A. BRYANT & ASSOCIATES, P.C.

_____

Steve A. Bryant
Federal I.D. 2752
Texas Bar No. 03277900
3618 Mt. Vernon, Suite A
Houston, Texas 77006
Telephone 713-526-7474
Facsimile 713-526-7720

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing has been served upon all counsel of record as herein below noted:

William D. Wood
Graig J. Alvarez
Fulbright & Jaworski, L.L.P.
1301 McKinney, Suite 5100
Houston, Texas 77010
Attorneys for Defendants, Triquest-Puget Plastics, L.L.C. and Arctic Slope Regional Corporation

Eduardo Roberto Rodriguez
R. Patrick Rodriguez
Rodriguez, Colvin & Chaney, L.L.P.
P. O. Box 2155
Brownsville, Texas 78522
Timothy G. O'Neill
Brent D. Anderson
Snell & Wilmer, L.L.P.
1200 Seventeenth St., Suite 1900
Denver, Colorado 80202
Attorneys for Defendants, Emerson Electric Co. and Wiegand Appliance Division of Emerson Electric Co.

Wendy Smith
Kirkpatrick & Lockhart, L.L.P.
535 Smithfield St.
Pittsburgh, Pennsylvania 15222
Attorney for Defendant, Chromalox, Inc.

Peter Blute
11601 Katy Freeway, Suite 101
Houston, Texas 77079
Attorney for Defendants, Dana Corporation and Dana Engine Controls

by depositing same in the U.S. mail, first-class postage and/or certified with return receipt requested, via facsimile and/or hand delivery on this _____ day of April, 2002.

_____
Steve A. Bryant